735 F.2d 884
 1984-2 Trade Cases 66,097, 15 Fed. R. Evid. Serv. 1956
 ADJUSTERS REPLACE-A-CAR, INC., Plaintiff-Appellant Cross-Appellee,
v.
AGENCY RENT-A-CAR, INC., Defendant-Appellee Cross-Appellant.
WAKELY & ASSOCIATES, INC., Plaintiff-Appellant Cross-Appellee,
v.
AGENCY RENT-A-CAR, INC., Defendant-Appellee Cross-Appellant.
 No. 83-1074.
 United States Court of Appeals,
Fifth Circuit.
 July 9, 1984.
Rehearing and Rehearing En Banc Denied Aug. 20, 1984.
 
 McFarland & Tondre, Brice A. Tondre, Houston, Tex., Robert R. Biechlin, Jr., San Antonio, Tex., for plaintiffs-appellants cross-appellees.
 Terry S. Bickerton, Deborah D. Williamson, A. Michael Ferrill, Cox & Smith, Inc., San Antonio, Tex., William R. Pakalka, Fulbright & Jaworski, Houston, Tex., for defendant-appellee cross-appellant.
 Appeals from the United States District Court for the Western District of Texas.
 Before JOHNSON, HIGGINBOTHAM, and DAVIS, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 We review the granting of judgment n.o.v. to the defendant in this private antitrust suit brought by Adjusters Replace-A-Car and Wakely & Associates, two insurance replacement car rental firms, against their rival, Agency Rent-A-Car, Inc. The principal accusation is that Agency employed predatory pricing in the San Antonio and Austin markets as part of an attempt to monopolize in violation of section two of the Sherman Act. Adjusters also charges that Agency hired away an essential employee in an attempt to monopolize the Corpus Christi market. Because we agree with the district court that plaintiffs failed to present a jury question regarding any of these claims, we affirm the judgment for Agency.
 
 
 2
 * Adjusters, Wakely, and Agency all operated in a segment of the rental car business, providing replacement cars to persons whose cars had been stolen or damaged in an accident. The replacement rental firm deals directly with insurance adjusters, and is able to offer a lower rate than the standard public rental firms because its rentals are often long-term and its operating and advertising costs are less. To the extent that firms specializing in insurance replacement rentals cannot satisfy the demand for such services, the public rental firms will also provide this service, though ordinarily at a higher cost to the insurer. The record indicates that a public rental firm wishing to compete directly in the insurance replacement segment of the market would be able to do so with relative ease.
 
 
 3
 In September 1973, Adjusters became the first insurance replacement rental firm to enter the San Antonio market. Wakely and Agency entered that market in October 1974, each charging a daily rental of $9.50; Adjusters' rate was then $8.50. Dissatisfied with its unprofitably small portion of the insurance replacement rental market in San Antonio, Agency cut its rental rate there to $8.00 per day in March 1975. When this tactic failed to increase its market share significantly, Agency in November 1975 reduced its rental rate to $7.00 per day.
 
 
 4
 At $7.00, Agency began to make substantial inroads into the San Antonio market. After four months it began increasing its price, first to $7.50, then to $8.00, and by July 1976 to $8.50. Agency admits that in San Antonio it suffered a net operating loss during the sixteen month period that its rental rate was set at $8.00 and below, and Adjusters and Wakely charge that Agency continued losing money until it raised its rental rate to $9.50 in February 1977.
 
 
 5
 In the Austin market, which Adjusters entered in December 1974 and Agency entered in November 1975, the $7.00 rental rate again proved a powerful tool with which Agency carved out a substantial share of the market. Agency's pricing in Austin evidently paralleled its pricing in San Antonio, and it again appears that Agency suffered net operating losses while offering the cheaper rate.
 
 
 6
 In December 1977, Adjusters left the Austin market and was replaced by Wakely, which charged first $10.00 and then $11.00; Agency was apparently charging $10.45 when Wakely entered that market. Agency cut its Austin rental rate to $9.00 in January 1979. Wakely initially responded with an $8.50 rate, but closed its Austin office after April 1979.
 
 
 7
 Adjusters opened its Corpus Christi office in January 1975, and held the great percentage of that market by the time Agency opened there in May 1976. Agency came to prominence, however, after it hired away Adjusters' office manager, Patty Manges, who brought many of Adjusters' clients with her to Agency. So successful was Agency that Adjusters left Corpus Christi by March 1977.
 
 
 8
 Adjusters went out of business in March 1978, closing its San Antonio office. Adjusters' Dallas office, not involved in this litigation, had closed in July 1977. Wakely continues to operate in San Antonio. Both companies argue that their business reversals were due to anticompetitive conduct by Agency, which was allegedly attempting to monopolize the insurance replacement rental market in San Antonio, Austin, and Corpus Christi.
 
 II
 
 9
 Section 2 of the Sherman Act, 15 U.S.C. Sec. 2, makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states." A party injured by such anticompetitive conduct may sue to recover treble damages under section 4 of the Clayton Act, 15 U.S.C. Sec. 15. Here the claim is one of attempted monopolization by Agency, and the burden on the plaintiffs is to prove the elements of this offense and a causal relationship between the Agency's anticompetitive conduct and the plaintiffs' proven damages. J.T. Gibbons, Inc. v. Crawford Fitting Co., 704 F.2d 787, 795 (5th Cir.1983).
 
 
 10
 The elements of an attempted monopolization under Sec. 2 of the Sherman Act are: "(1) specific intent to accomplish the illegal result; and (2) a dangerous probability that the attempt will be successful." Spectrofuge Corp. v. Beckman Instruments, Inc., 575 F.2d 256, 276 (5th Cir.1978), cert. denied, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). The intent must be to do more than compete vigorously; vigorous competition is precisely what the antitrust laws are designed to foster. Thus, "[a] statement of intent to compete ... even if perceived as a threat is not unlawful. Such a manifestation of intent to triumph in the competitive market, in the absence of unfair, anticompetitive or predatory conduct, is not enough to establish an antitrust violation." Hayes v. Solomon, 597 F.2d 958, 977 (5th Cir.1979), cert. denied, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). Rather, the forbidden specific intent is that of acquiring and exercising "the power to fix prices or to exclude competition." United States v. du Pont & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956); American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 1140, 90 L.Ed. 1575 (1946); Spectrofuge, 575 F.2d at 276.
 
 
 11
 Adjusters and Wakely argue that the jury was entitled to infer that Agency had the requisite intent and was dangerously likely to succeed at monopolizing the insurance rental market in the relevant geographical area from evidence that Agency's pricing and operational strategies drove competitors from the marketplace when market conditions prevented other firms from entering the market to compete with Agency. The specific conduct which plaintiffs allege was anticompetitive is Agency's use of a predatory pricing regimen in San Antonio and Austin, and Agency's deliberate efforts to "steal" Adjusters' Corpus Christi customers by hiring away Adjusters' office manager in that city. Adjusters and Wakely claim that this anticompetitive conduct caused them injury in their trade or business.
 
 
 12
 Responding to interrogatories, the jury found that Agency had attempted to monopolize the insurance replacement car market in San Antonio and Austin by means of its pricing in 1975 and 1976, in Austin by means of its pricing in 1978 and 1979, and in Corpus Christi by means of hiring Patricia Manges. Total damages, without trebling, were set at $800,000.[1]
 
 
 13
 Defendants moved for judgment notwithstanding the verdict, and filed a brief supporting the motion. On this basis, the trial judge granted a judgment n.o.v. and dismissed the case.[2] Adjusters and Wakely appeal.[3]
 
 III
 
 14
 There is obviously a tension inherent in the legal assignment to protect competition but not competitors. Fighting hard but fair, avoiding ruinous competition and avoiding predation are often-used catchwords that fail in their central normative purpose--they do not segregate desired and undesired conduct in the marketplace. As a seeming precursor to the current willingness of courts to be informed by economics, Professors Areeda and Turner, lawyer and economist, undertook to suggest measures with content. Their effort was sufficiently successful that the starting point for an analysis of a predatory pricing claim is now their influential article, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697 (1975), in which they analyze a firm's pricing in terms of that firm's average total cost, average variable cost, and marginal cost of production.
 
 
 15
 Basic economic theory subscribed to by Areeda and Turner teaches that in a perfectly competitive market a small manufacturer's price is dictated by the marketplace, and his production will be at the level where the marginal cost of producing another unit of output exactly equals the price that he will receive for this unit. A manufacturer's costs are divided between fixed costs, which do not vary with the level of production and cannot be avoided even if production shrinks to zero, and variable costs, which do vary with production and roughly equal the cost of the resources necessary to produce additional units of output. Because marginal cost is an economic concept with no exact counterpart in accounting, Areeda and Turner employ average variable cost as a surrogate for marginal cost.[4]
 
 
 16
 According to Areeda and Turner, a firm is always acting reasonably if it charges a price for its output that enables it to recover at least its average variable costs, because at that price the company is recovering the costs associated with producing each individual unit of output. The firm will, of course, prefer to recover its average total cost, but if it is unable to do so it will minimize its losses if it produces those units of output for which it can recover at least its variable costs. This is so because, in the short run at least, a firm cannot escape paying its fixed costs even if it reduces its production to zero.
 
 
 17
 Areeda and Turner argue that predatory pricing occurs only when a firm sets its price at a level below its average variable cost. At this price, the firm is suffering a loss on every unit of output it produces and sells, and its behavior is rational only if it hopes by engaging in this conduct to drive its competitors from the market and thereby gain monopoly powers that will enable it to charge a monopoly price in the future. This sort of pricing conduct is economically undesirable because the monopoly profits garnered by the monopolist over the long term will more than offset the short term benefit to consumers of the low predatory price. Competitors, of course, are harmed also, either by being driven from the market or by being disciplined into following the price leadership of the monopolist.
 
 
 18
 In this court's first major statement on predatory pricing following publication of the Areeda-Turner article, we adopted much of its analysis. International Air Industries, Inc. v. American Excelsior Co., 517 F.2d 714 (5th Cir.1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). We defined "predatory" to mean that the defendant "must have at least sacrificed present revenues for the purpose of driving [plaintiff] out of the market with the hope of recouping the losses through subsequent higher prices." Id. at 723. We agreed with Areeda and Turner that "a price above average cost is a fairly competitive price for it is profitable to the monopolist if not to its rivals; in effect, the price excludes only less efficient firms." Id. By contrast, "a firm's pricing behavior can be considered anticompetitive when it sells at a price below its average variable cost." Id. at 724.
 
 
 19
 One important exception to the principle that a price above average variable cost is presumed lawful occurs when there are substantial barriers to new entry into the relevant market. In such a case, we expressed concern that even a price above average variable cost might enable a monopolist to drive an existing competitor out of the market, whereafter the entry barriers would enable the monopolist to realize substantial monopoly profits. As the barriers to entry increase, so does the degree to which the monopolist's price may exceed his average variable cost and yet still be deemed predatory. Id. at 724-25 & n. 31. In sum:
 
 
 20
 [I]n order to prevail as a matter of law, a plaintiff must at least show that either (1) a competitor is charging a price below his average variable cost in the competitive market or (2) the competitor is charging a price below its short-run, profit-maximizing price and barriers to entry are great enough to enable the discriminator to reap the benefits of predation before new entry is possible.
 
 
 21
 Id. at 724 (footnotes omitted). Finally, we cautioned that it is "important to look to the price discriminator's costs, rather than his competitor's cost, to determine whether the price discrimination was anti-competitive." Id. at 724-25.
 
 
 22
 The objective economic approach to predation that we adopted in American Excelsior is still the law of this circuit. At the same time, however, we declined to adopt Areeda and Turner's proposed per se test for predatory pricing whereby a price above average variable cost would be per se non-predatory and a price below average variable cost per se predatory. We were unwilling, in an attempted monopolization case, to relegate the intent element to the status of an automatic and irrebuttable inference.
 
 
 23
 That interest in the defendant's intent surfaced in Malcolm v. Marathon Oil Co., 642 F.2d 845 (5th Cir.), cert. denied, 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981), where we declared that "[p]redatory pricing differs from healthy competitive pricing in its motive: a predator by his pricing practices seeks 'to impose losses on other firms, not garner gains for itself.' " Id. at 853-54, quoting L. Sullivan, Handbook of the Law of Antitrust 111 (1977). While the Malcolm panel noted the ongoing debate between partisans of an economic test for predation--the Areeda-Turner approach--and partisans of an intent test--the Sullivan approach--and disclaimed any view of the merits of these alternative analytical frameworks, id. at 854 n. 17, this court had already joined the economic camp in American Excelsior, and that decision bound the panel deciding Malcolm as it binds this panel. See White v. Estelle, 720 F.2d 415, 417 (5th Cir.1983).
 
 
 24
 Our latest statement on predatory pricing briefly iterates the teaching of American Excelsior:
 
 
 25
 One seeking to establish predatory pricing must demonstrate that the defendant "at least sacrificed present revenues for the purpose of driving [the plaintiff] out of the market with the hope of recouping losses through subsequent higher prices." International Air Industries v. American Excelsior Co., 517 F.2d 714, 723 (5th Cir.1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). Generally, in order to prove that the defendant has sacrificed present revenues, it is necessary to establish that the defendant's prices were below marginal or average variable cost.
 
 
 26
 Bayou Bottling, Inc. v. Dr Pepper Co., 725 F.2d 300, 305 (5th Cir.1984).[5] In sum, although we follow with interest the continuing debate over theories of predation, the law in this circuit is that where barriers to entry are not pronounced predatory pricing is not established unless the defendant has set his price below his average variable cost.[6]
 
 IV
 
 27
 We review then the evidence to determine if it can sustain a finding that Agency charged a price below its average variable cost. If the evidence cannot support this finding, we must next determine if there is evidence that barriers to entry existed which could render even a price above average variable cost predatory. Related particularly to this latter inquiry, we must then query whether market conditions generated a dangerous probability that defendant would succeed in attaining a market position which would enable it to control the market price. We conclude as a matter of law that plaintiffs here failed on all three counts.
 
 
 28
 Before trial, plaintiffs filed requests for admissions under Fed.R.Civ.P. 36. The first request was: "During the period of time that Agency charged $7.00 per day for a rental unit in San Antonio, its San Antonio rental office experienced a net loss from operations." The second request substituted "Austin" for "San Antonio." The third request dealt with Agency's $8.00 price in San Antonio, and the fourth request dealt with Agency's $8.00 price in Austin. Agency admitted that all four propositions were true.
 
 
 29
 At trial, plaintiffs relied almost exclusively on these admissions as evidence that Agency had engaged in predatory pricing. Plaintiffs did not offer any evidence respecting Agency's variable and fixed costs of operation. Rather, plaintiffs interpreted Agency's admission that it had suffered "a net loss from operations" to be effectively an admission of predatory pricing. This was a costly error.
 
 
 30
 Plaintiffs fought admission of exhibits showing that Agency operations in San Antonio and Austin earned revenues greater than their costs during some of the months covered by the admissions and less than their costs during some others of these months. Plaintiffs argued that the exhibits conflicted with the admissions, but the exhibits were admitted when the trial judge concluded that the admissions related only to total costs and total revenues; when a portion of Agency's headquarters overhead was allocated to the individual offices, each showed a net loss throughout the period covered by the admissions. The defense exhibits, which made no provision for an allocation of centralized operating costs, were not inconsistent.
 
 
 31
 Admission of these exhibits afforded Agency an opportunity to demonstrate that the price it charged for a rental car never dropped below its average variable costs. Agency's expert testified, based on these documents, that Agency's average variable costs in San Antonio and Austin during the relevant time periods fluctuated between approximately $3.65 and approximately $5.00. Thus, Agency's price was always at least 40% greater than its average variable cost. The expert also testified that Agency's average variable costs in Austin were $5.23 when Agency went to a $9.00 price there in January 1979; the price was thus 72% above average variable cost. This testimony cut to the quick of plaintiffs' predatory pricing claim, and Adjusters and Wakely urge that admission of the defense exhibits upon which defendant's expert wholly relied was reversible error.
 
 
 32
 First, Adjusters and Wakely contend that the exhibits conflict with Agency's admissions that it operated at a net loss, but we reject this argument for the same reason as the trial judge: The admissions and the exhibits do not conflict. This is apparent when one has in mind what costs are reflected in each.
 
 
 33
 Second, plaintiffs charge that they were never given access to the underlying documents summarized in the profit and loss statements. The trial judge found, however, that plaintiffs bore most of the blame if they were surprised by the testimony of Agency's expert, for they had turned down an opportunity to take his deposition before trial. The underlying documents were in fact made available to plaintiffs, and they would have known which ones were important to their case if they had taken the deposition of Agency's expert. Plaintiffs, however, erroneously assumed that Agency's admissions gave them all the ammunition they needed, and were surprised to discover at trial that their big gun was not loaded.
 
 
 34
 Plaintiffs cry foul. Agency, they charge, took advantage of their misapprehension concerning the importance of the admissions. Even assuming this to be true,[7] nothing in our adversary system prevents Agency from exploiting plaintiffs' error by watching silently as plaintiffs failed to carry their burden of proof. Agency was under no obligation to teach Adjusters and Wakely about the rudiments of predatory pricing or to point out the difference between a net operating loss and a price below average variable cost. Instead, this distinction was brought out at trial to rebut any impression that plaintiffs had established a prima facie case of predatory pricing.[8]
 
 
 35
 Adjusters and Wakely seek now to convince us that Agency's price was below its average variable costs when it charged a $7.00 and $8.00 rental rate for its automobiles. Such evidence, however, had to be set before the jury, and the record shows that plaintiffs failed to carry their burden even of proving a prima facie case of below-cost pricing. Although plaintiffs challenged many of the assumptions shaping the opinion of Agency's expert, the record is devoid of any positive evidence that Agency's average variable cost ever exceeded its prices. Judgment n.o.v. is appropriate when "there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question." Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc). This record will not support a finding that Agency's price was ever inadequate to cover its average variable costs.[9]
 
 
 36
 Under the American Excelsior rule, plaintiffs might still prevail if they were able to establish that the barriers to entry were sufficiently high to render even a price above average variable cost predatory. The insurance replacement car market is neither a natural monopoly nor a heavily regulated industry. Plaintiffs argue, however, that barriers existed in the form of high start-up costs and the need for contacts within the insurance industry. We find that the only conclusion permitted by the record is that the barriers to entry into this market were slight--not negligible, perhaps, but assuredly not so great as to permit a monopoly born of predatory pricing to be exploited before new competition would scotch the potential for extra-normal profits.[10]
 
 
 37
 This last conclusion dooms not only plaintiffs' claim of predatory pricing, but also another necessary element of their case--the dangerous probability of success. If the market structure will not allow a dominant firm to set its price above the competitive level, the strictures of the antitrust laws are not activated. The injury to plaintiffs' business is not cognizable under the antitrust laws if competition itself is not harmed. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488-89, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).
 
 
 38
 Only Adjusters, during its first year of operations, had the luxury of being the sole firm in San Antonio specializing in insurance replacement rentals. Significantly, Adjusters' founder testified that during this period he was able neither to set a monopolist's price nor to prevent competitors from entering the market.
 
 
 39
 On this record, the trial judge concluded that, as a matter of law, plaintiffs failed to establish that Agency engaged in anticompetitive conduct in San Antonio and Austin which created a dangerous probability that Agency would come to wield monopoly powers in those markets. We agree with this conclusion, and accordingly affirm the granting of judgment n.o.v. on these claims.
 
 V
 
 40
 In Corpus Christi, Adjusters' complaint rests on the fact that Agency hired Adjusters' former office manager, Patty Manges, and that many of Adjusters' customers followed her to Agency. Adjusters charges that Manges was lured away from her job with that company, and that she was specifically induced to draw away Adjusters' customers.
 
 
 41
 The case principally relied upon by both parties is Associated Radio Service Co. v. Page Airways, Inc., 624 F.2d 1342 (5th Cir.1980), cert. denied, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981). Page must be read on its facts. Within a narrowly framed market, we found an antitrust violation on the basis of evidence that the defendant had induced the plaintiff's employees to act disloyally in steering business toward the defendant while they were evidently still in the employ of the plaintiff. Here there was no evidence that Manges acted inimically to Adjusters' interests until she had already left their employ for Agency.
 
 
 42
 Page supports the view that "the mere hiring away of employees from a rival" is lawful. 624 F.2d at 1354. The fact that the employee then uses her own skills and contacts--and not, for example, misappropriated trade secrets--to generate business for her new employer, even at the expense of her old employer, provides no basis for antitrust liability. The record here contained nothing more, and we hold accordingly that judgment n.o.v. was properly granted to Agency on this claim.
 
 VI
 
 43
 In sum, plaintiffs have failed to establish that any injury caused their businesses as a result of Agency's participation in the insurance replacement car rental market in San Antonio, Austin, and Corpus Christi stemmed from anticompetitive conduct comprehended by section 2 of the Sherman Act. Predatory pricing was not shown in San Antonio and Austin; anticompetitive hiring practices were not shown in Corpus Christi. Plaintiffs likewise failed to establish a dangerous probability that Agency could have come to monopolize any of these markets. As the evidence was insufficient to support a jury verdict for the plaintiffs, entry of judgment n.o.v. was appropriate.
 
 
 44
 AFFIRMED.
 
 
 
 [1]
 The damage award was broken down as follows:
 San Antonio Adjusters: $271,000
 Wakely: 88,000
Austin Adjusters: 182,000
 Wakely: 162,000
Corpus Christi
 Adjusters: 97,000
 
 
 [2]
 The court's order reads: "Having considered Defendant's Motion for Judgment Notwithstanding the Verdict, Plaintiffs' response thereto and the argument of counsel, as well as the evidence presented at trial hereof, the Court finds that said motion should be granted for the reasons set forth in Defendant's brief in support thereof."
 We have many times disapproved the use of such brief, unilluminating orders granting judgment in complex cases. Most recently, in Myers v. Gulf Oil Corp., 731 F.2d 281, 283 (5th Cir.1984), we described an order almost identical to this one as being "pithy to the point of being incomplete," and we vacated a summary judgment so that the district judge could provide us with an adequate statement of reasons for his action. Such a statement by the trial court is essential to effective review. Id. at 284; Jot-Em-Down Store (JEDS) Inc. v. Cotter & Co., 651 F.2d 245, 247 (5th Cir.1981).
 Here, though practical concerns persuade us to review and decide this case, we are left guessing about the district court's reason for granting judgment n.o.v. Did the district court conclude that plaintiffs failed to prove prima facie unlawful pricing? that they failed to prove dangerous likelihood of success? that they failed to prove fact of injury, or amount of damages, or causation? Perhaps Agency prevailed on all these issues; because the district court has said only that it adopts the arguments in Agency's post-verdict brief, we are effectively forced to assume that such is the case.
 We are, of course, sympathetic to the trial court's limited resources--especially time--in the face of a heavy caseload. A lengthy opinion is not always required, and arguments may be incorporated from the parties' briefs if they are specifically recited rather than adopted en masse. In the final analysis, however, it is the trial court's exercise of judgment that we review, and in a case such as this one we must see more evidence of that judgment than a boilerplate order if we in turn are to perform our function effectively.
 
 
 [3]
 In their initial appellate brief, plaintiffs argued that Agency's motion for judgment n.o.v. should not have been entertained by the trial judge because Agency allegedly did not make an adequate motion for directed verdict at the close of all the evidence as prescribed by Fed.R.Civ.P. 50(b). Agency, moved for directed verdict at the close of the plaintiffs' evidence, laying out the various grounds on which it thought it was then entitled to judgment. At the close of the defendant's case, Agency briefly reurged its motion for directed verdict, incorporating the grounds urged in its initial motion
 Since plaintiffs' original brief was filed, this court has decided two cases involving similar contentions about allegedly insufficient motions for directed verdicts. Bohrer v. Hanes Corp., 715 F.2d 213 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984); Elliott v. Group Medical & Surgical Service, 714 F.2d 556 (5th Cir.1983). In both cases we rejected a rigid application of Rule 50(b), holding that if the court and counsel were adequately informed of the defendant's challenge to the sufficiency of plaintiff's evidence a motion for judgment n.o.v. could thereafter be entertained. Bohrer and Elliott control this case; the trial judge properly considered Agency's motion for judgment n.o.v.
 
 
 [4]
 Although variable costs and marginal costs will differ at some points along the production possibilities curve, we note simply that, so long as marginal cost did not significantly exceed average variable cost during the relevant time, any difference is not germane to our analysis
 
 
 [5]
 Sister circuits have also weighed the merits of Areeda and Turner's economic analysis of predation. Although all have accepted the basic premises of the Areeda and Turner formulation, most have expressed some reservations about supplanting entirely the intent-based test, and none have adopted a per se cost-based test. Of particular interest are the discussions in MCI Communications Corp. v. American Tel. & Tel. Co., 708 F.2d 1081 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014 (9th Cir.1981), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); and Northeastern Tel. Co. v. American Tel. & Tel. Co., 651 F.2d 76 (2d Cir.1981), cert. denied, 455 U.S. 943, 102 S.Ct. 1483, 71 L.Ed.2d 654 (1982). A helpful overview of the caselaw in this area is Vawter & Zuch, A Critical Analysis of Recent Federal Appellate Decisions on Predatory Pricing, 51 Antitrust L.J. 401 (1983). A less comprehensive discussion of the caselaw accompanies an interesting and thought-provoking synopsis of the principal alternative theories of predatory pricing advanced in the legal and economic literature in Calvani & Lynch, Predatory Pricing under the Robinson-Patman and Sherman Acts: An Introduction, 51 Antitrust L.J. 375 (1983)
 
 
 [6]
 We recognize that a cost which is regarded as fixed in the short-run may become variable in the long-run, as, for example, when durable goods wear out and are either replaced or not. In most cases, however, we think it will be obvious to judges and juries which costs are appropriately viewed as fixed and which as variable over the relevant time period. When a legitimate dispute arises as to the characterization of certain costs, the question is one of fact to be resolved by the jury. See William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d at 1036-38
 
 
 [7]
 The record does suggest that Agency did not share plaintiffs' misapprehension:
 THE COURT: * * * Mr. Tondre [plaintiffs' counsel] says they relied on these admissions and even after this [defense] expert was tendered, I mean, the expert negated the admissions at least insofar as certain months were concerned. He came up and said the average variable cost was exceeded by these prices.
 MR. BICKERTON [defendant's counsel]: Which was never any response--there was never any interrogatory. They have never asked us about costs, your Honor. I think that is the point in this case, and if you look at American Excelsior, it is not whether you make a profit or loss. It is the cost. Cost is the test in a predatory price increase [sic ] case.
 Agency made the same point in another exchange:
 MR. BICKERTON: We are not changing the admission.
 THE COURT: You are modifying it or explaining it, right? You are saying it ain't so.
 MR. BICKERTON: We are saying we agree that we lost money--you know, frankly, he didn't couch the question properly: Did you have a net loss? Net loss is not even a relevant issue in a predatory pricing case. Below cost or above cost, that is the issue ....
 
 
 [8]
 Thus, the following exchange occurred on direct examination of Agency's expert:
 Q. Can a firm charge a price still above its average variable cost and still sustain a net loss in the period that you mentioned?
 A. Can a firm charge a price above the average variable price [sic ] and yet still maintain a net loss?
 Q. For the period?
 A. Yes.
 Q. Is it true, then, that the term "average variable cost" and whether you are above or below average variable cost doesn't necessarily have anything to do with whether or not you are making a net profit or loss?
 A. I would expect that if you are above average variable cost but below average total cost, you might be sustaining a loss.
 Q. Talking about different concepts?
 A. That's right.
 Earlier in the trial Agency's chairman had also revealed a businessman's instinctive grasp of this concept:
 Q. Pursuant to court procedures, pursuant to what is called a request for admissions, [Agency] has admitted that during the time Agency was charging $7.00 and $8.00 in San Antonio and Austin, it was losing money in those offices. That is the state of the record.
 A. Sir, we could be charging $50 per car when we first open and still lose money.
 
 
 [9]
 Nor, given the essentially fungible character of the product and the relatively low plant investment, is it surprising that there is no suggestion that marginal cost ever exceeded average variable cost
 
 
 [10]
 Sensitive to the stricture that when a judgment n.o.v. is sought the evidence must be viewed "in the light and with all reasonable inferences most favorable to the party opposed to the motion," Boeing Co. v. Shipman, 411 F.2d at 374, we set out some of the exchanges at trial that underlie our conclusion. Most direct was the testimony of Agency's expert:
 Q. [D]o you have an opinion as to whether or not any company could have charged a monopoly [price] in the replacement car rental business?
 * * *
 A. In my opinion no company could have established a monopoly in San Antonio in the auto replacement rental business at that time.
 Q. Why is that?
 A. Primarily, there are no barriers to entry. Should a company be able to, even for a short period of time, exclude competition and raise their prices to an unusual profit, the market would be flooded by competitors to compete away any monopoly profits. There are so low barriers to entry into the business from what I can learn that there could be no monopoly in that industry.
 A jury question would have been presented, of course, if plaintiffs' evidence had been to the contrary. Instead, plaintiffs' expert effectively endorsed the defense expert's assessment:
 Q. Do you remember we had some discussion about replacement[?] Didn't you tell me in the deposition it was your perception that it would be easy for the daily car companies, the Hertz and Avises to get into the business whether or not they are in it at this time? You said that?
 A. I think it would be easy for me to get in it. I guess it obviously would be easy for them.
 Q. I think you also indicated it would be easy for the new car dealers to get into the business whether or not they were in it at this time?
 A. That is correct.
 Even more damaging to plaintiffs' case were the admissions made by the founder and president of Adjusters:
 Q. Essentially, all it takes to be in the replacement car business or the insurance rental business is cars and an office and a decision to be involved in that business, isn't that true?
 A. And some knowledge.
 Q. Some knowledge. Wouldn't you assume that Hertz or Avis or any existing car rental company would have at least as much about the replacement car rental business as you did when you started the business?
 A. Yes, but they would want to specialize.
 Q. So, you would agree with me, then, would you not, that there is a possible ready transition by the Hertzes and the Avises into the insurance rental business even to a larger extent than they are now?
 A. Yes.
 Q. And isn't there also another source of competition in the replacement car insurance rental business, that being the car dealers?
 A. Some car dealers.
 * * *
 Q. [I]f the new car dealer made the decision to get into the replacement car business in San Antonio, all it would take would be the decision to do it and acquiring the knowledge?
 A. It is the same as in any business.
 Q. Is there any reason to think they couldn't develop a fantastic business within a year just like you did?
 A. No.
 * * *
 Q. And we also know that regardless of how many actual competitors there are for this business, there are a whole lot of potential competitors, isn't that true[?]
 A. There is a lot of potential, yes.