**H. Floyd McGAHEE, Plaintiff,**

v.

**NORTHERN PROPANE GAS COMPANY, Defendant.**

**Civ. A. No. C83–2617A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

April 10, 1987.

James L. Paul, Gambrell, Clarke, Anderson & Stolz, Atlanta, Ga., Frank C. Vann, Vann & McClain, Camilla, Ga., for plaintiff.

Emmet J. Bondurant, Jane F. Vehko, Bondurant, Mixson & Elmore, Atlanta, Ga., for defendant.

## ORDER

SHOOB, District Judge.

### I. *Introduction*

Plaintiff H. Floyd McGahee ("McGahee") brought this antitrust action under Section 2 of the Sherman Act, 15 U.S.C. § 2, and under the Robinson-Patman Act, 15 U.S.C. § 13(a), alleging that defendant Northern Propane Gas Company ("Northern Propane") practiced predatory pricing in the retail sale of propane gas. Defendant has moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P. For the reasons stated below, the Court will grant defendant's motion.

The following truncated version of the relevant facts should suffice for present

purposes. Propane is a liquid hydrocarbon by-product of crude petroleum and natural gas. The fuel is used for heating and for agricultural functions, such as crop-drying. Because propane does not yield carbon monoxide when burned, it is well-suited to operate industrial vehicles that are used indoors (e.g., forklifts). Propane is a fungible product; consequently, price is of prime importance in the marketplace. Prior to 1981, propane prices were subject to federal regulation. This case involves developments after the market was deregulated in mid–1981.

During the relevant period, the parties operated competing retail propane sales outlets in the Camilla, Georgia area. From September, 1979 to June, 1981, McGahee served as Northern Propane's district manager. McGahee had long been a fixture in the Camilla area, having worked at the same propane outlet for approximately thirty years under several owners.[1] In June, 1981, however, McGahee was demoted to a salesperson position because, according to defendant, he failed to keep adequate records, to keep the accounts receivable current, and to follow company directives. McGahee resigned from defendant's employ on October 9, 1981, under contentious circumstances.[2]

In May 1982, after obtaining a loan from the Small Business Administration, plaintiff started his own propane sales business. Once on his own, plaintiff acquired a significant percentage of the market and of defendant's client base, and the price war giving rise to this action ensued. With this limited background in place, the Court will turn to the pending motion, highlighting additional facts where appropriate.

## II. *Analysis*

### A) *The Summary Judgment Standard*

At the outset, the Court will set forth the standard controlling practice under Rule 56. To prevail at summary judgment, the moving party must demonstrate the absence of genuine disputes of material fact and factual inferences. *Thrasher v. State Farm Fire and Casualty Co.*, 734 F.2d 637, 638–39 (11th Cir.1984) (per curiam). Recent Supreme Court cases have explained that the moving party need not negate the nonmoving party's case; instead, "the burden on the moving party may be discharged by 'showing'—that is, pointing out ...—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, — U.S. —, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. *Celotex*, 106 S.Ct. at 2553–54. Thus, summary judgment is appropriate where there is no genuine issue of material fact and, viewed in the light most favorable to the nonmoving party, the undisputed facts warrant judgment as a matter of law. *Id.* at 2555.

There are, to be sure, factual disputes in the record presented here, but these disputes are not material under the applicable law. Plaintiff argues that defendant acted in large measure out of personal animus. Following this theme, plaintiff depicts himself as an underdog facing a national company bent on destroying his business and monopolizing the relevant market through

---

**1.** In September, 1979, Northern Propane's then-parent company, InterNorth, Inc. ("InterNorth"), purchased the retail propane outlet in Camilla from Amoco Oil. InterNorth employed Northern Propane, a wholly-owned subsidiary, to operate its retail propane outlets in the United States. On November 30, 1983, InterNorth sold all its stock in Northern Propane to Penn Central Energy Group.

**2.** Defendant had filed a counterclaim against plaintiff, alleging that he breached his fiduciary duties while under its employ. Specifically, defendant alleged that plaintiff engaged in self-dealing by extending credit to a corporation in which he had a financial interest, McGahee Family, Inc. In addition to the alleged conflict of interest, the counterclaim asserted that plaintiff's allocation of credit to McGahee Family, Inc. was wrongful because the corporation was not credit-worthy. Defendant voluntarily dismissed the counterclaim on February 25, 1985.

predatory price cuts.[3] Defendant counters that it acted solely to maintain its share of a stagnant market. In ruling on the instant motion, the Court cannot and need not divine the intent behind defendant's pricing policy. Nonetheless, viewing the record objectively, as is proper in a predatory pricing case, *see, e.g., Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir.), *cert. denied*, 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984), the Court concludes that plaintiff's claims fail as a matter of law.

### B) *The Sherman Act Claim*

To establish an attempted monopolization claim under Section 2 of the Sherman Act,[4] a plaintiff must show (1) that the defendant attempted to achieve a monopoly, and (2) that there was a dangerous probability of success. *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905); *Tiftarea Shopper, Inc. v. Georgia Shopper, Inc.*, 786 F.2d 1115 (11th Cir. 1986) (per curiam); *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development Corp.*, 711 F.2d 989, 996 (11th Cir.1983). Plaintiff's claim fails to satisfy either element of this test.

### 1) Attempt to Monopolize

It is well-settled that proof of a predatory price scheme can satisfy the first element of a Section 2 claim. *E.g., id.* There is vast disagreement, however, regarding the proper standard for determining whether a defendant has engaged in predatory pricing.[5] Neither the Supreme Court nor the Eleventh Circuit has set forth a definitive standard, so the Court must elect which of the competing standards to employ. This task requires an understanding of the nature of predatory pricing and the role such schemes play in the economy.

■ In a predatory pricing scheme, a dominant firm drastically cuts its prices to drive weaker rivals from the market or to deter new rivals from entering the market. *See, e.g., Matsushita Electric Industrial*

---

**3.** For the purposes of the instant motion, defendant conceded that the relevant product market is propane and that the relevant geographic market is Mitchell and Baker counties in the southwestern region of Georgia. The Court notes, however, that there are some difficulties with plaintiff's asserted relevant geographic market. The cost of transportation limits the range in which a retail propane seller can operate profitably, but there is evidence that propane distributors who were active in Mitchell and Baker counties were also active in neighboring counties. On the other hand, even though other fuels may substitute for propane, there is, at the very least, an issue of fact as to whether propane constitutes a distinct product market. *See United States v. Empire Gas Corp.*, 537 F.2d 296, 303–304 (8th Cir.1976), *cert. denied*, 424 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977).

**4.** Section 2 of the Sherman Act provides the following:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

**5.** Most Circuits have followed some adaptation of the cost-based analysis first advocated by Professors Areeda and Turner in their landmark article, Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975). *See, e.g., Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir.1980); *AT & T v. FCC*, 602 F.2d 401, 410 n. 49 (D.C.Cir.1979); *Pacific Engineering & Production Co. of Nevada v. Kerr-McGee Corp.*, 551 F.2d 790, 797 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *International Air Industries v. American Excelsior Co.*, 517 F.2d 714 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). The Supreme Court has also indicated a preference for cost-based analysis over traditional notions of intent. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 1355 n. 8, n. 9, 89 L.Ed.2d 538 (1986).

In the instant case, plaintiff advocates a test relying on traditional notions of intent and long-term cost analysis. Defendant argues that the Court is bound by the modified Areeda/Turner test employed by the former Fifth Circuit in *Industrial Air*, 517 F.2d at 724. As developed further in the text below, *see infra* at 194–195, *Industrial Air* may well be dispositive, binding precedent; moreover, the Court concludes that the approach followed in *Industrial Air* is the most sound.

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1355 n. 8, 89 L.Ed.2d 538 (1986). "Predation in any meaningful sense cannot exist unless there is a temporary sacrifice of net revenues in the expectation of greater future gains." Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 698 (1975); *see also Matsushita*, 106 S.Ct. at 1357; *International Air Industries v. American Excelsior Co.*, 517 F.2d 714, 723 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); Easterbrook, *Predatory Strategies and Counterstrategies*, 48 U.Chi.L.Rev. 263, 268 (1981). Thus, to succeed, a predator must tame the market sufficiently to achieve the power to set supracompetitive prices; in addition, the predator must retain monopoly power long enough for "[t]he ... flow of profits, appropriately discounted, ... to exceed the present size of the losses" incurred by the price cut. R. Bork, *The Antitrust Paradox* at 145 (1978); Williamson, *Predatory Pricing: A Strategic and Welfare Analysis*, 87 Yale L.J. 284, 292 (1977); Areeda & Turner, *supra*, 88 Harv.L.Rev. at 698. Of course, in a market with pronounced entry barriers, a predator's investment is less risky, since it is easier to retain monopoly power in such a market. *Id.* at 699; *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 891 (5th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985); *International Air*, 517 F.2d at 724.

Given the inherently speculative nature of predatory pricing schemes, "there is a consensus among commentators that ... [such tactics] are rarely tried, and even more rarely successful." *Matsushita*, 106 S.Ct. at 1357–58; *see* R. Bork, *supra*, at 149–55; Areeda & Turner, *supra*, 88 Harv.

L.Rev. at 699; Koller, *The Myth of Predatory Pricing—An Empirical Study*, 4 Antitrust Law & Econ.Rev. 105 (1971). On the other hand, advancing a claim of predatory pricing may seem attractive to an inefficient competitor reeling from stiff price competition. Because such suits can stifle competition, a standard that can be applied readily at summary judgment may best serve antitrust policy. *See, e.g., Williamson, supra*, 87 Yale L.J. at 288; *cf. Harlow v. Fitzgerald*, 457 U.S. 800, 818–20, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982).[6]

Against the foregoing backdrop, the Court has little trouble rejecting plaintiff's suggestion that this case be judged under traditional subjective notions of intent. Simply stated, an objective test for predatory pricing is necessary to forestall nuisance suits that could chill the vigorous price competition that antitrust laws seek to foster. Accordingly, in recent years, courts faced with predatory pricing claims have almost uniformly relied on cost-based standards. There is, nonetheless, considerable debate as to which cost-based test is superior. *See generally* Vawter & Zuch, *A Critical Analysis of Recent Federal Appellate Decisions on Predatory Pricing*, 51 Antitrust L.J. 401 (1983). As noted above, *see supra* at n. 5, the Court will apply the test enunciated by the former Fifth Circuit in *International Air*, a test based largely on rules first formulated by Professors Areeda and Turner.

Areeda and Turner proposed two chief rules for judging predatory pricing claims: (1) "a price at or above the defendant's average variable cost should be conclusively presumed lawful"; and (2) "a price below reasonably anticipated average variable cost should be conclusively presumed unlawful."[7] Areeda and Turner, *supra*, 88

---

**6.** As Professor Williamson has explained,

To be sure, the demise of any firm has painful consequences for the affected employees and investors. Seen in a broader context, however, the elimination of inefficiency is a leading benefit of competition. It is crucial to make the distinction between protecting competitors and protecting competition. Sentiment is a cruel hoax if it leads to protecting competitors, since the consumer is invariably the loser when such rules are introduced.

Williamson, *Predatory Pricing: A Strategic and Welfare Analysis*, 87 Yale L.J. 284, 288–89 (1977).

**7.** Average variable cost is the sum of all costs that vary according to output divided by the output. It is employed as a surrogate for a more instructive measure, marginal cost, which is the increase to total cost resulting from each additional increment of output. This substitution is necessary because marginal costs are

Harv.L.Rev. at 733; *see also* P. Areeda and D. Turner, *Antitrust Law* ¶¶ 711–722 (1978); Areeda & Turner, *Williamson on Predatory Pricing*, 87 Yale L.J. 1337 (1978). These rules rest on the theory that a price above or equal to average variable cost ("AVC") is reasonable because at such a price the seller is more than defraying the cost of producing each unit. Conversely, at a price under AVC, the seller is losing money on each unit; such conduct, the theory goes, evinces a desire to drive others from the market so that supracompetitive prices can be set after a monopoly is attained. Rivals may well be destroyed by pricing policies set at the AVC of a leading firm, but only if they are less efficient. Areeda and Turner concluded that, in most markets, the assets of failing rivals would fall into the hands of new and more efficient firms. 88 Harv.L.Rev. at 698–99. This scenario is consonant with the policies underlying the antitrust laws. *See supra* at n. 6.

In *International Air,* the former Fifth Circuit accepted Areeda and Turner's basic premises but added a significant gloss. Specifically, the court formulated a different standard for markets in which entry barriers are extremely high. In such cases, a plaintiff can prevail by showing that the defendant "is charging a price below its short-run, profit-maximizing price...." 517 F.2d at 724. The court offered the following rationale for this approach:

> We employ the profit maximizing standard only because of our deference to a situation in which a monopolist could drive a slightly less efficient firm out of the market by charging a price above its own average cost, but then charge a very high price because of the difficulty of new entry. This standard should be applied only when the barriers to entry are extremely high. The lower the barriers to entry in a market, the closer to marginal cost a monopolist would have to set its price in order for a plaintiff to prevail as a matter of law, for we see no social utility in insuring the survival of inefficient firms where a new entry is possible.

*Id.* at 724 n. 31.

■ Defendant contends that the Court is bound by *International Air* and that that case demands that judgment be entered in its favor. *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (decisions rendered by the former Fifth Circuit before October 1, 1981, are binding upon the courts of the Eleventh Circuit). Plaintiff asserts that the holding of *International Air* applies only to cases in which a plaintiff seeks to prevail as a matter of law. This is a close question. The *International Air* Court noted that its statements "should be relevant to the prima facie elements" of a predatory pricing claim, but the holding is arguably limited to "the elements necessary [for a plaintiff] to sustain a motion for a directed verdict." [8] 517 F.2d at 724 n. 30. Panels of the new Fifth Circuit have concluded that *International Air* establishes the prima facie case for predatory pricing. *Adjusters Replace-A-Car,* 735 F.2d at 890; *Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d at 305; *but see Malcolm v. Marathon Oil Co.,* 642 F.2d 845 (5th Cir.), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981). This arcane point is of little significance, however, for the Court would use the *International Air* test to define plaintiff's

difficult to ascertain and is acceptable because marginal cost will exceed average variable cost only when a firm approaches its maximum output, an unlikely time for predation. *See International Air Industries v. American Excelsior Co.,* 517 F.2d 714, 724 n. 28 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

**8.** The *International Air* Court was concerned that its preferred view would run counter to the Supreme Court's holding in *Utah Pie Co. v. Con-*tinental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). *See* 517 F.2d at 724 n. 30. *Matsushita Electric Industries Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1355 n. 8, 89 L.Ed.2d 538 (1986), indicates that *Utah Pie* does not resolve the "debate ... about what 'cost' is relevant in [predatory pricing] cases." Thus, *Matsushita* suggests *International Air* should be read for the broader of its two plausible holdings.

prima facie case in any event.[9] Subjective evidence of intent or other measures of cost may be of some relevance. But, unless pronounced entry barriers exist, a plaintiff must submit some evidence of sales below AVC to present a triable issue as to predatory pricing.

In the instant case, plaintiff's claim fails under the *International Air* test. To be sure, the parties' fierce price war injured McGahee. The inquiry, however, must focus on an objective analysis of the relevant market and on defendant's pricing strategy. Mere injury is not enough to sustain a predatory pricing claim, and that is all plaintiff has shown.

■ As to market conditions, the record demonstrates that there were no significant entry barriers. Typical examples of entry barriers include the following: (1) the need for a government license; (2) lack of access to a patent, trade secret, or other indispensable element of production; (3) prohibitively high capital costs peculiar to new market entrants; and (4) entrenched buyer preferences. P. Areeda & D. Turner, *Antitrust Law* ¶ 409 (1978); *see also Adjusters Replace-A-Car*, 735 F.2d at 893–94.

■ Assessing a closely related market, the Eighth Circuit concluded that "barriers to entry in this industry are minimal...." *United States v. Empire Gas. Corp.*, 537 F.2d 296, 305 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). It is not difficult to obtain a license to sell propane, and the fuel is available to new firms. Certainly, the initial capital investment is not prohibitive. Plaintiff was able to obtain a Small Business Administration loan and quickly garner a large share of the market. This scenario, in itself, effectively rebuts plaintiff's contention that entry barriers existed. *See Adjusters Replace-A-Car*, 735 F.2d at 893–94. Furthermore, defendant has stated, without contradiction, that other former employees have successfully started their own propane sales businesses. To the extent customer loyalty or buyer preference is a factor, plaintiff had the edge. Given plaintiff's well-established ties to the community, he was able to win over many of defendant's customers. The record indicates that, even at a higher price, many propane users preferred to buy from plaintiff. In sum, while defendant undoubtedly enjoyed some competitive advantages, they are not significant enough to invoke the alternative "profit maximizing standard" set forth in *International Air*.[10] Thus, plaintiff can avoid summary judgment only if there is an issue of fact under the AVC standard.

■ The AVC standard turns on the defendant's costs rather than the plaintiff's. *International Air*, 517 F.2d at 724–25. Thus, it is irrelevant that defendant's prices were set below plaintiff's costs. Convinced that *International Air* is unsound in principle, plaintiff devoted most of his energy to advocating alternative tests. *See supra* at notes 5 and 9. There is, perhaps as a result of this tactic, nothing from plaintiff in the record to show that defendant sold propane below its AVC. The only evidence as to defendant's pricing policy was submitted by defendant in an effort to disprove plaintiff's theory. *Celo-*

---

**9.** Plaintiff criticizes the Areeda-Turner approach on the grounds that it relies on a static economic analysis devoid of strategic considerations. *See* Williamson, *Predatory Pricing: A Strategic Welfare Analysis*, 87 Yale L.J. 284 (1977). He advocates a test relying on long-run incremental cost and traditional notions of intent.

Over the short run, the AVC rule encourages the most efficient use of economic resources. The rules advocated by plaintiff are more difficult to apply and less likely to yield an efficient economy. *See International Air Industries v. American Excelsior Co.*, 517 F.2d 714, 724 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). Plaintiff's proposed rules might be justified if predatory pricing were a serious problem but, as noted above, *see supra* at 192–193, it is not. Thus, in the Court's view, the entry barrier gloss added by *International Air* is sufficient to prevent the limited practical potential for the strategic use of above variable cost pricing.

**10.** It must be remembered that entry barriers must be "extremely high" for the profit maximizing standard to be applicable. *International Air Industries v. American Excelsior Co.*, 517 F.2d 714, 724 n. 31 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

*tex* and other recent cases teach that defendant's effort on this score was superfluous, *see infra* at note 11; nonetheless, the effort is persuasive.

■ Defendant's argument as to the AVC standard is supported by the affidavits of Hugh A. Gower ("Gower"), who is a partner in the accounting firm of Arthur Andersen & Company, and who is familiar with the relevant market. Viewed as a whole, Gower's affidavits set forth defendant's average variable costs and show that there were no significant sales below those costs. Plaintiff has disputed certain of Gower's calculations but has not submitted any evidence that these disputes are critical to the bottom line.[11] Nor has plaintiff submitted any independent evidence of sales below defendant's AVC. Thus, there is no issue for trial under *International Air*. Even if there were, summary judgment would be proper because plaintiff cannot satisfy the second element of an attempted monopolization claim—a dangerous probability of success. *Swift*, 196 U.S. at 396, 25 S.Ct. at 279.

### 2) Dangerous Probability of Success

Explaining the dangerous probability element, the Fifth Circuit offered the following observation:

> If the market structure will not allow a dominant firm to set its price above the competitive level, the strictures of the antitrust laws are not activated. The injury to plaintiffs' business is not cognizable under the antitrust laws if competition itself is not harmed.

*Adjusters Replace-A-Car*, 735 F.2d at 894. Here, the primary marketing feature of the product at issue is price, since propane is fungible. Thus, absent extremely favorable conditions, a propane seller would have little hope of recouping the loss resulting from severe price cuts.

■ There is no evidence that defendant has ever been able to obtain supracompetitive prices, and this prospect seems unlikely. While defendant controlled a large segment of the market, there were four significant market participants and two lesser lights. Any effort to charge inflated prices would likely have caused defendant to lose business to the other established firms. Even if price cuts could temporarily drive all competitors from the putative relevant market—Mitchell and Baker counties—they would return as soon as defendant raised its prices.[12]

Furthermore, plaintiff's rapid success in the market reveals that changing propane suppliers is simple. That fact coupled with relatively low start-up costs suggests that new sellers would enter the market even if defendant could drive its competitors out of business entirely.[13] The Court also notes

---

**11.** Plaintiff's challenges to Gower's affidavits are not without force. For example, plaintiff points out that Gower did not include wages as a variable cost. In the abstract, it is certainly debatable that wages qualify as a variable cost, and an issue of fact can exist as to whether certain costs are variable or fixed. *See Adjusters Replace-A-Car v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 891 n. 6 (5th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985). Gower has, however, offered a reasonable explanation for his approach. *See* Affidavit of Hugh A. Gower at ¶ 16. ("Northern Propane had excess capacity and could have sold a significant number of additional gallons of propane gas without hiring additional employees....") And plaintiff has neither refuted this explanation nor submitted any contrary expert testimony. The Court also notes that Gower defined several arguably fixed costs as variable. *Id.* at ¶ 24, Exhibit B and Exhibit B-1.

Thus, it would be proper to conclude that Gower's testimony negated plaintiff's claim. In other words, defendant's showing exceeded the burden imposed by Rule 56. It bears emphasizing once again that defendant was not required to affirmatively rebut plaintiff's theory. Under the Supreme Court's recent pronouncements on summary judgment, merely pointing out that plaintiff's claim lacked factual support shifted to plaintiff the burden of producing some evidence of sales under defendant's AVC. *See supra* at 191–192. Despite ample discovery, plaintiff failed to satisfy that burden.

**12.** As noted above, *see supra* at note 3, no propane dealer confined its operations to Mitchell and Baker counties. In fact, the parties competed with eight other propane retailers in a nine-county area.

**13.** The Court acknowledges that new market participants might be deterred because the relevant market was stagnant. By the same token, the limited potential for market growth made it less likely defendant could hope to reap significant benefits from its alleged predatory conduct.

that defendant's market share declined during 1981–1983. Courts have viewed such declines as evidence that an alleged attempt to monopolize is not dangerously close to success. *E.g., Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir.1982). Consequently, even assuming *arguendo* that defendant attempted to achieve a monopoly through predatory price cuts, the Court finds no evidence that such a scheme had a dangerous probability of success.

Accordingly, the Court will grant summary judgment as to plaintiff's Sherman Act claim.

C) *The Robinson-Patman Act Claim* [14]

Plaintiff's Robinson-Patman Act claim is based on defendant's sales in Mitchell and Baker counties at prices below those charged in other counties. There is little to be said on this claim. *International Air* holds that a predation theory, if valid, will support a Robinson-Patman Act claim. *See also Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). Still, because identical standards control predation theories under both statutes, the Court's conclusion as to the claim under Section 2 of the Sherman Act dictates that the Robinson-Patman Act claim be dismissed. *See, e.g., Bayou Bottling*, 725 F.2d at 305 (applying *International Air* to a claim under Section 2 of the Sherman Act).

III. *Conclusion*

What has been said above, especially with respect to the dangerous probability of success factor, demonstrates that plaintiff's theory is almost as implausible as the conspiracy theory advanced in *Matsushita*. There, Justice Powell cautioned against

carelessly allowing such theories to proceed to trial: "mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect." 106 S.Ct. at 1360. The record shows that there were ill-feelings between the parties and that plaintiff suffered as a result of the price war. These facts may be lamentable; we all feel for the small businessperson who cannot compete with a large, well-heeled concern. But the antitrust laws promote competition and efficiency. Judged under objective criteria, plaintiff's claims fail to implicate those goals. As has been stated often, antitrust laws protect competition, not individual competitors. *See supra* at note 6.

Therefore, defendant's motion for summary judgment is GRANTED. The Clerk is DIRECTED to enter judgment accordingly.

---

**14.** In pertinent part, the Robinson-Patman Act provides as follows:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in each discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....