**MAIN STREET PUBLISHERS, INC., Plaintiff,**

v.

**LANDMARK COMMUNICATIONS, INC., et al., Defendants.**

**No. WC87–142–B–D.**

United States District Court, N.D. Mississippi, W.D.

Dec. 19, 1988.

Douglas Berry, Nashville, Tenn., Gerald A. Gafford, Oxford, Miss., for plaintiff.

Jack F. Dunbar, John H. Dunbar, Oxford, Miss., Conrad M. Shumadine, Becky A. Powhatan, Walter D. Kelley, Jr., Norfolk, Va., for defendants.

## MEMORANDUM OPINION

BIGGERS, District Judge.

The court has before it the defendants' motion for summary judgment. Having read the parties' memoranda and exhibits and being advised of the premises, the court is in a position to rule on the merits. New Albany Publishing Company is a subsidiary of Landmark Community Newspapers which in turn is owned by Landmark Communications. All of the named defendants join in the motion for summary judgment.

### I.

William Rutledge, III owned the local newspaper in New Albany, Mississippi, the New Albany Gazette, and the paper's free advertising circular, the Gazette Guide. In February, 1979, Rutledge sold the New Albany Gazette and the Gazette Guide to New Albany Publishing Company, Inc. (New Albany Publishing). When Rutledge sold his paper to New Albany Publishing, he agreed not to compete with the New Albany Gazette or the Gazette Guide for five years.

Bill Cassett was a sales director and manager of the New Albany Gazette and the Gazette Guide from 1969 until 1984. In 1985 Cassett, Rutledge and Kenneth Owen formed Main Street Publishers (Main Street) to publish a free circulating shopping guide. When Main Street began soliciting advertisers for its shopping guide, it offered full page ads for $345.00. At that time New Albany Publishing offered full page ads for $586.95. Initially, Main Street secured several major advertisers because of its lower advertising rates.

On May 1, 1985, New Albany Publishing lowered its advertising rates for a full page ad to $465.69 and it simultaneously conducted its own public opinion survey. Based in part on the survey, New Albany Publishing told advertisers that its market penetration in the New Albany area was better than any other print medium and it claimed sixty-eight percent of those asked said the New Albany Gazette and the Gazette Guide were their main source of shopping information. During the summer of 1985, Rick McCay, New Albany Publishing's sales director, went to several advertisers and asked them why they used Main Street to advertise. According to Main Street, McCay told advertisers that Main Street was not an effective advertising medium and was financially unsound.

In July, 1985 New Albany Publishing offered frequency contract insert rates which provided advertisers lower rates for long-term contracts. In September or Au-

gust, 1985 New Albany Publishing placed an ad in its publications which indicated the New Albany Gazette and the Gazette Guide were the only papers delivered to every household in New Albany by mail. Main Street delivered its free shopper by carrier.

During the fall and winter of 1985–1986, New Albany Publishing secured several advertisers which had advertised with Main Street. In November, 1985 New Albany Publishing obtained the Joy Supermarket account for $657.90 for a two-page ad, even though Main Street had charged Joy only $600.00 for the same type of ad. Joy Supermarket never advertised with Main Street again. In January, 1986 New Albany Publishing offered its advertisers free color print in the advertisements which cost the defendant $0.75 per page per 1000 ads printed.

From January, 1986 until July, 1987, the major advertisers in the New Albany area stopped advertising with Main Street and advertised exclusively with the defendant. After the last major advertiser left Main Street in July, 1987, Main Street went out of business.

While Main Street was publishing its free shopper it offered two-page advertisements for $600.00, full-page advertisements for $345.00 to $300.00 and half-page advertisements for $150.00.

Main Street blames New Albany Publishing for driving it out of business. It claims New Albany Publishing engaged in unfair competition in violation of the Sherman Antitrust Act and Mississippi State law. New Albany Publishing asserts that Main Street cannot prove the elements of an antitrust claim. Since Main Street has the burden of proving its claims, it must make a sufficient showing to establish the existence of each element essential to its case in order to overcome the defendants' motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273, (1986).

> [T]he Supreme Court made clear that summary judgment may be especially appropriate in an antitrust case because of the chill antitrust litigation can have on legitimate price competition. [475 U.S. 574] 106 S.Ct. [1348] at 1360 [89 L.Ed.2d 538]. For this reason, when opposing a motion for summary judgment, an antitrust plaintiff must present evidence that tends, when interpreted in a light most favorable to plaintiff, to exclude the possibility that defendant's conduct was as consistent with permissible competition as with legal conduct. *Id.* at 1357.

*McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1493 (11th Cir.1988) (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## II.

Main Street claims it is entitled to relief through Mississippi's antitrust statutes. Miss.Code Ann. § 75–21–1, et seq. (1972). The Mississippi antitrust statutes were enacted shortly after the Sherman Antitrust Act and, like the Sherman Act, the Mississippi statutes proscribe attempts to monopolize a market by unfair competition. According to to the Mississippi Supreme Court, the Mississippi statutes only prohibit specific forms of unfair competition enumerated in the act. Other forms of competition not specifically proscribed in Mississippi's antitrust statutes are subject to the federal antitrust statutes. *Wagley v. Colonial Baking Co.*, 208 Miss. 815, 45 So.2d 717, 721 (1950). Accordingly, the Mississippi antitrust statute supplements the Sherman Antitrust Act. *See Pounds Photogeraphic Labs v. Noritsu America Corp.*, 818 F.2d 1219, 1226 (5th Cir.1987).

Main Street failed to present evidence of forbidden forms of competition proscribed by the Mississippi antitrust statute. Consequently, the court will refer to the federal statutes to ascertain whether the plaintiff presented evidence which gives rise to an antitrust claim.

## III.

The federal antitrust laws were enacted to safeguard healthy competition in the marketplace. All competitors try to increase their business which may result in excluding competitors from a given market. *Walker v. U–Haul of Miss.*, 747 F.2d

1011, 1015 (5th Cir.1984). The Sherman Antitrust Act protects competitors from unfair competition "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570, 571, 86 S.Ct. 1698, 1703, 1704, 16 L.Ed.2d 778 (1966). In order to prevail on a claim under section 2 of the Sherman Antitrust Act, Main Street must show that New Albany Publishing possessed monopoly power and that it maintained its power by unfair competition. *United States v. Grinnell Corp.*, 384 U.S. at 570, 571, 86 S.Ct. at 1703, 1704.

> There is obviously a tension inherent in the legal assignment to protect competition but not competitors. Fighting hard but fair, avoiding ruinous competition and words that fail in their central normative purpose—they do not segregate desired and undesired conduct in the marketplace.

*Adjusters Replace-A-Car v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 889 (5th Cir.1984).

It is possible that New Albany Publishing could have succeeded in regaining complete control of the New Albany advertising market by offering a better, less expensive product because it was more efficient. Thus, a gain in market share by New Albany Publishing and a corresponding loss by Main Street standing alone will not establish liability under the Sherman Act:

> Mere loss of profits shows no more than that [a competitor] was forced to charge a competitive price because it faced competition. Similarly, the large size of the discriminator and even the fact that its sales increased during the period of discrimination would not necessarily make out a case. *Anheuser-Busch, Inc. v. FTC*, 289 F.2d 835, 839, 843 (7th Cir.1961). It is possible for damage to a single competitor to meet the statutory requirements, *see Borden Co. v. FTC*, 381 F.2d 175 (5th Cir.1967), but a showing of more than competitive pricing and a shift of customers is necessary. Evidence of certain types of predatory conduct, we feel, would fulfill the requirements.

*International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 722 (5th Cir.1975), *reh'g denied*, 521 F.2d 815, *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349.

When Main Street started publishing its free circulating shopper, New Albany Publishing was the only publisher of print advertising in the New Albany area. After Main Street went out of business, the defendant regained complete control of the New Albany market. Even though New Albany Publishing had a monopoly, it could use legitimate means to compete with Main Street for advertisers. "[C]utting prices in order to increase business is the very essence of competition. Thus, mistaken inferences ... are especially costly because they chill the very conduct the antitrust laws are designed to protect." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538, 557 (1986) (cite omitted).

The Sherman Act proscribes unfair competition which has been described as predatory conduct. Predatory conduct is established by proof that the defendant "sacrificed present revenues for the purpose of driving [the plaintiff] out of the market with the hope of recouping the losses through subsequent higher prices." *International Air Industries*, 517 F.2d at 723. Main Street claims the defendant lowered its advertising rates, agreed to long-term advertising contracts, made disparaging remarks about Main Street, and hired away two of Main Street's key employees in order to drive the plaintiff out of the New Albany advertising market. Initially, the court must determine whether these alleged acts can be considered predatory as a matter of law. Then the court must ascertain whether Main Street presented sufficient evidence to give rise to a factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed. 2d 265, 273 (1986).

### IV.

Courts have applied the principles in the Sherman Act by referring to the price com-

petitors charged for their products. A larger competitor can often survive a short term loss by reducing its prices so as to drive smaller, more efficient competitors from the market, and then raise prices without fear of competition. The difference between the price a competitor charges in relation to its cost of producing a product can show whether a firm was willing to take a short term loss solely to drive competitors from the market. The Fifth Circuit discussed the way in which a competitor's pricing affects a market:

> A manufacturer's costs are divided between fixed costs, which do not vary with the level of production and cannot be avoided even if production shrinks to zero, and variable costs, which do vary with production and roughly equal the cost of the resources necessary to produce additional units of output....
>
> ... [A] firm is always acting reasonable if it charges a price for its output that enables it to recover at least its average variable costs, because at that price the company is recovering the costs associated with producing each individual unit of output. The firm will, of course, prefer to recover it average total cost, but if it is unable to do so it will minimize its losses if it produces those units of output for which it can recover at least its variable costs. This is so because in the short run at least, a firm cannot escape paying its fixed costs even if it reduces its production to zero.
>
> ... [W]hen a firm sets the price at a level below its average variable cost, the firm is suffering a loss on every unit of output it produces and sells, and its behavior is rational only if it hopes by engaging in this conduct to drive its competitors from the market and thereby gain monopoly powers that will enable it to charge a monopoly price in the future.
>
> "... [A] price above average cost is a fairly competitive price for it is profitable to the monopolist if not to its rivals; in effect, the price excludes only less efficient firms." *Id.* By contrast, "a firm's pricing behavior can be considered anticompetitive when it sells at a price below its average variable cost." *Id.* at 724.

One important exception to the principle that a price above average variable cost is presumed lawful occurs when there are substantial barriers to new entry into the relevant market. In such a case, we expressed concern that even a price above average variable cost might enable a monopolist to drive an existing competitor out of the market, whereafter the entry barriers would enable the monopolist to realize substantial monopoly profits. As the barriers to entry increase, so does the degree to which the monopolist's price may exceed his average variable cost and yet still be deemed predatory. *Id.* at 724–25 & n. 31. In sum:

> [I]n order to prevail as a matter of law, a plaintiff must at least show that either (1) a competitor is charging a price below his average variable cost in the competitive market or (2) the competitor is charging a price below its short-run, profit-maximizing price and barriers to entry are great enough to enable the discriminator to reap the benefits of predation before new entry is possible.

*Adjusters Replace–A–Car,* 735 F.2d at 889–890 (5th Cir.1984) (quoting *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976)).

Main Street does not claim that the New Albany print-advertising market had any substantial barriers to entry. Thus, in order to show the defendant engaged in predatory pricing, Main Street must present some evidence that New Albany Publishing charged below its average variable cost for advertising. The test adopted by the Fifth Circuit relies solely on an objective comparison of cost and pricing. *See McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1494 (11th Cir.1988) (discussing the Fifth Circuit's view). According to the uncontested evidence submitted to the court, New Albany Publishing had an average variable cost of $73.30 before July 1, 1987 for producing a page of advertising and an average variable cost of $77.17 thereafter.

Its cost for producing color coverage in a full-page ad was $0.75 per page per 1000. While New Albany Publishing competed with Main Street, New Albany Publishing charged between $345.00 and $300.00 for a full-page ad.

■ Main Street complains that the average variable cost of producing newsprint is an inappropriate standard by which to gauge unfair competition in a local newspaper advertising market. Main Street argues that the defendant had to pay the overhead cost of its news and editorial staff. With this additional overhead, Main Street argues, it cost the defendant between $400.00 and $450.00 to produce a page of print advertising. Main Street complains that if New Albany Publishing's average variable costs were only $77.00 per page, Main Street could not possibly prove predatory pricing. Thus, Main Street asks the court to make an exception to the Fifth Circuit's objective standard and use the total cost of producing a page of advertising as a standard to gauge predatory pricing.

Aside from the obvious difficulties foreseen by ignoring the guidance of the Fifth Circuit, there are several problems with Main Street's pleas. It is difficult to distinguish between a price set to attract potential customers and to expand market share from a price set to eliminate competitors.

The latter benefits the public and is the very result an open economy is supposed to promote in the first place. No matter what the intent, both effects may well ensue. Thus, the results of alleged predatory conduct and vigorous entrepreneurship of the type antitrust is supposed to make possible may sometimes look very much alike. Attacks on low prices as constituting predatory pricing can be used to turn the antitrust laws into a device to prevent competition rather than promote it.

Givens, *Antitrust: An Economic Approach* § 3.04 (1987).

The Fifth Circuit has established objective guidelines to carry out the principles of the Sherman Antitrust Act. This court has neither the authority nor the inclination to ignore these principles. Consequently, the court will follow the Fifth Circuit's guidance and apply its objective test of predatory pricing.

■ New Albany Publishing set a price in response to competition which was well above its average variable cost of producing print advertising. Main Street has failed to present evidence to overcome the presumption that a price above the average variable cost is not predatory. *See Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735 (9th Cir.1985), *cert. denied,* 475 U.S. 1087, 106 S.Ct. 1471, 89 L.Ed.2d 727, *reh'g denied,* 476 U.S. 1131, 106 S.Ct. 2002, 90 L.Ed.2d 681.

Initially, Main Street claimed New Albany Publishing entered exclusive dealing contracts which unfairly foreclosed the New Albany print advertising market to Main Street in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. During discovery, Main Street learned that these advertising contracts did not prohibit advertisers from doing business with Main Street. Main Street now argues that these contracts constitute unfair competition in violation of section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

Since there is no evidence that New Albany Publishing conspired with anyone to control the New Albany advertising market, Main Street's claims arising under section 1 of the Sherman Antitrust Act will be dismissed. *See Monsanto v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775, 785–786 (1984); *H & B Equipment v. International Harvester*, 577 F.2d 239, 244 (5th Cir.1978).

■ On January 1, 1987 New Albany Publishing offered one-year advertising contracts to major advertisers for $377.97 for a single page ad and $678.54 for a double page ad. Main Street argues that these low cost, long-term contracts encouraged advertisers to deal only with the defendant and, as a result, these contracts were predatory.

"[V]irtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market, namely

the portion consisting of what was bought." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983). Here again, a distinction must be drawn "'between practices which tend to exclude or restrict competition on the one hand, and the success of a business which reflects only a superior product, a well-run business, or luck on the other.'" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, at 604, 105 S.Ct. 2847, at 2858, 86 L.Ed.2d 467, at 482 (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962)).

In *Barry Wright Corp. v. ITT Grinnell Corp., supra,* the First Circuit discussed a similar contract in a market consisting of two competitors. In *Barry Wright,* as in this case, the defendant corporation offered special discounts to a buyer if the buyer agreed to a long-term, large volume contract. The discount price was above the defendant's average variable cost of producing its product. The plaintiff complained that these contracts unfairly excluded competition in violation of section 2 of the Sherman Act. The First Circuit noted:

> There is "an important difference between a 'requirements' contract and a contract which calls for the purchase of a definite quantity over a period of time which the buyer estimates to be sufficient to meet his requirements." *Tampa Electric Co. v. Nashville Coal Co.*, 276 F.2d 766, 771 (5th Cir.1960), *rev'd on other grounds*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). A true requirements contract flatly eliminates the buyer from the market for its duration; a fixed quantity contract leaves open the possibility that the buyer's needs will exceed his contractual commitment; he is free to purchase from others any excess amount that he may want. This flexibility is important here, for it left [the primary buyer in the market] the legal power to buy small (and then in 1979, larger) amounts from [the plaintiff] should they have become available. . . .
>
> [T]he record suggests the existence of legitimate business justifications for the

agreements from the perspectives of both buyer and seller. For [the buyer], the contracts guaranteed a stable source of supply, and, perhaps, more important, they assured [the buyer] a stable, favorable price. For [the defendant], they allowed use of considerable excess snubber capacity; and they allowed production planning that was likely to lower costs. . . .

*Id.* at 237.

In its brief, Main Street acknowledged that New Albany Publishing's frequency contracts "facilitate planning for the buyer, who is assured of a source of supply at a set price." These contracts also assured the defendant a continued source of advertising and helped it plan the production of its newspaper. Thus, the contracts enhanced New Albany Publishing's efficiency. Moreover, the advertising rates New Albany Publishing charged for the frequency contracts were comparable to Main Street's advertising rates and were well above the defendant's average variable cost.

New Albany behaved competitively by offering a dependable medium for advertising at a competitive price. There is no proof that these contracts foreclosed the print advertising market to Main Street. Instead, the only proof shows the rates charged in these contracts were above or equal to Main Street's rates and the advertisers could freely advertise with Main Street if they chose to.

Main Street also alleges that the defendant's employees made disparaging statements which may have caused Main Street to lose advertisers. New Albany Publishing told advertisers that it was the only print medium delivered by mail in Union County and that its publications were more effective. Rick McCay, the defendant's sales manager, also told Lamar Jackson of Jackson Supermarkets that if Jackson stopped advertising with Main Street, Main Street would go out of business. Main Street argues that this statement inferred Main Street was financially unsound. Main Street concedes that it cannot identify any advertisers who stopped advertising

with it because of New Albany Publishing's comments, but asserts "...these factors may have been a factor in losing ...business." Aside from the plaintiff's need to prove causation, and thus an antitrust injury, the plaintiff must present evidence to show that the defendant's statements were false. According to the Fifth Circuit:

Basically, actionable disparagement is a "statement about a competitor's goods which is untrue or misleading and which is made to influence or tends to influence not to buy. 'Nims, Unfair Competition by False Statement or Disparagement, 19 Cornell L.Q. 63, 70.' " *Edwin L. Wiegand Co. v. Harold E. Trent Co.*, 3 Cir., 1941, 122 F.2d 920. Mere puffing of one's product, claiming its superiority over a competitor's product, is not disparagement.

*Aerosonic Corporation v. Trodyne Corporation*, 402 F.2d 223, 231 (5th Cir.1968).

■ Main Street failed to present evidence which would show that New Albany Publishing's statements were false. Main Street concedes that the defendant's statements were literally true, nevertheless it complains the statements disparaged Main Street. Both Main Street and New Albany Publishing compared the quality of their publications to each other's. Comparing one's products is the essence of advertising and mere "puffing" cannot support a claim of unfair competition. Additionally, nothing presented by the plaintiff indicates the defendant's statements concerning Main Street's financial health were untrue or misleading. In fact, Bill Cossett, an officer of Main Street, had acknowledged in a memo that Main Street would go out of business if it lost the Jackson Supermarket account and, in fact, this is what occurred. Since the plaintiff failed to present evidence that the defendant's statements were false, its claim for disparagement will be dismissed.

■ Finally, Main Street argues that New Albany Publishing hired two of its key employees, and this amounts to unfair competition. In *Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc.*, 735 F.2d 884, 894 (5th Cir.1984), the Fifth Circuit stated:

"[T]he mere hiring away of employees from a rival" is lawful. 624 F.2d at 1354. The fact that the employee then uses her own skills and contacts—and not, for example, misappropriated trade secrets—to generate business for her new employer, even at the expense of her old employer, provides no basis for antitrust liability. The record here contained nothing more, and we hold accordingly that judgment n.o.v. was properly granted to Agency on this claim.

*Id.* at 894 (quoting *Associated Radio Service Co. v. Page Airways, Inc.*, 624 F.2d 1342 (5th Cir.1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981)). Main Street's allegations simply assert that two of Main Street's employees quit and went to work for New Albany Publishing. This alone cannot give rise to a claim of unfair competition. Additionally, Main Street failed to provide the court with any proof that these two employees misappropriated Main Street's business secrets.

The plaintiff has the burden of presenting some evidence to establish the existence of the elements of an antitrust suit. However, the facts presented do not give rise to a viable claim for unfair competition. Consequently, the defendants are entitled to summary judgment and this action will be dismissed.