**CALLER–TIMES PUBLISHING COMPANY, INC., Appellant,**

v.

**TRIAD COMMUNICATIONS, INC., d/b/a, Wheels & Keels, Appellee.**

No. 13–88–328–CV.

Court of Appeals of Texas, Corpus Christi.

April 12, 1990.

Rehearing Granted April 12, 1990.

Second Motions for Rehearing Overruled May 3 and May 10, 1990.

Jorge C. Rangel, Rangel & Chriss, Corpus Christi, Mike A. Hatchell, Ramey, Flock, Hutchins & Jeffus, Tyler, for appellant.

Arnold Anderson Vickery, E. Landers Vickery, Vickery & Kilbride, Houston, for appellee.

Before NYE, C.J., and KENNEDY and BENAVIDES, JJ.

## OPINION ON MOTION FOR REHEARING

KENNEDY, Justice.

Appellee's motion for rehearing is granted, and our prior opinion is withdrawn.

Triad Communications, Inc. d/b/a Wheels and Keels brought suit against the Caller–Times Publishing Company, Inc. (publisher of the Corpus Christi Caller–Times newspaper), claiming that the Caller–Times engaged in monopolization and predatory pricing practices in violation of the Texas Free Enterprise and Antitrust Act of 1983, Tex.Bus. & Com.Code Ann. §§ 15.01–15.51. Triad also claimed that the Caller–Times tortiously interfered with its

contractual and business relationships. The jury found that the Caller–Times targeted Wheels and Keels' customers for special deals and that such targeting proximately caused Wheels and Keels damages of $364,416.00. Accordingly, the trial judge entered judgment for $1,096,248.00, trebling the jury's damage award pursuant to Tex.Bus. & Com.Code Ann. § 15.21(a)(1) (Vernon 1987). The trial court ordered prejudgment interest, injunctive relief, and attorney's fees.

The Caller–Times raises points on appeal concerning the legal and factual sufficiency of the evidence to support liability and damages both under antitrust and tortious interference theories, the award of prejudgment interest, and the award of a permanent injunction.

The Caller–Times' first six points of error relate to Triad's antitrust claims. The Caller–Times claims that the trial court erred in overruling its motion for judgment *non obstante veredicto* because Triad failed to prove that the Caller–Times' advertising rates or prices offered were below its average variable cost. In conjunction with this claim, the Caller–Times argues that the jury's finding that it targeted Wheels and Keels customers does not constitute a violation of the Texas antitrust statute. On the other hand, Triad argues that targeting its customers for special deals is exclusionary conduct, which will support a monopolization claim, and that federal case law is still unresolved on the question of what constitutes predatory pricing.

Triad brought suit based upon alleged violations of Tex.Bus. & Com.Code Ann. § 15.05(b) (Vernon 1987) which states: "It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." Tex.Bus. & Com.Code Ann. § 15.04 (Vernon 1987) provides that the purpose of the Act is to maintain and promote economic competition in trade and commerce. To the extent consistent with this purpose, the Act must be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes. *See* Tex.Bus. & Com.Code Ann. § 15.04 (Vernon 1987). The language of the federal statute dealing with monopolization is similar to that of Tex.Bus. & Com.Code Ann. § 15.05(b). *See* 15 U.S.C.A. § 2 (Supp.1990) (the Sherman Act).

Antitrust laws were enacted to safeguard healthy competition in the marketplace. These laws protect competitors from unfair competition, not a competitor's growth or development based upon a superior product, business acumen, or historical accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

A plaintiff must prove two elements to establish an attempted monopolization claim under § 2 of the Sherman Act: 1) the specific intent to accomplish an illegal result and 2) a dangerous probability that the attempt will be successful. *Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc.*, 735 F.2d 884, 887 (5th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985). The first element may be established through predatory pricing, which Triad specifically alleged.

Our review of the evidence shows that in 1984, George Magel and David Mock, former Caller–Times employees, purchased Wheels and Keels for $10,000.00. The circular featured display and classified advertisements of automobiles and boats. Its market was primarily Corpus Christi and the surrounding area. Six months after purchasing the circular, Magel and Mock generated $40,000.00 to $50,000.00 in business. In 1985, the business grossed $178,000.00. At some point, business began dropping off. Magel and Mock, believing that the Caller–Times was engaged in monopolistic practices, filed suit alleging that special deals were being offered to Wheels and Keels customers. Specifically, they alleged that deals were being offered to customers agreeing not to advertise in Wheels & Keels.

Victor Hernandez runs a transmission repair shop in Corpus Christi. He advertised in Wheels and Keels. According to Hernandez, after Mock and Magel purchased Wheels and Keels, someone from

the Caller–Times named Luna contacted him. Ms. Luna told him that she could give him the same ad he purchased from Wheels and Keels for ten to twelve dollars less. She told Hernandez that she was giving him the fifty-two week rate. Hernandez testified that he was the one who first mentioned Wheels and Keels to the individual from the Caller–Times. He asked her if she was looking at the ad he had placed in Wheels and Keels. She said "no," but she would get a copy of the ad to examine.

David Mock testified that the Caller–Times' employees approached Wheels and Keels' accounts and offered customers special deals meant to take business away from Wheels and Keels. He said that it had an adverse impact on the business and curtailed growth. As an example, Mock testified that on February 27, 1985, Wheels and Keels ran an ad for Gulfway Motors. Gulfway was supposed to run the ad for two days, but Mock learned that Gulfway did not want the second ad to run. The day before, an ad had appeared in the Caller–Times, using a photograph taken by Mock and given to Gulfway. Mock said that Gulfway paid about $.47 a line; however, the rate card published by the Caller–Times indicated that they should have been charged double that amount. Subsequently, Gulfway did very little business with Wheels and Keels.

Liberty Mobile Homes also ran ads with the Caller–Times and Wheels and Keels. Before Magel and Mock took over the paper, the Caller–Times was charging Liberty $1.02 a line for an ad. In January 1985, the Caller–Times began charging $.55 a line. Mock testified that after that time Liberty never ran the same volume of ads with Wheels and Keels as they had previously.

Vista Chevrolet started advertising in Wheels and Keels in March, 1985 and stopped in May, 1985. The Caller–Times' bill for the following month indicated that Vista had received a reduction in rates, from $.52 to $.30 a line. Pagan–Lewis started running ads in Wheels and Keels at the end of 1984. In March, 1985, they ran full page ads. In May, 1985, after Pagan–Lewis had signed a six month contract with Wheels and Keels, they were given a $.30 per-line charge from the Caller–Times. Pagan–Lewis then canceled its Wheels and Keels contract.

Ron Cardwell, an advertising agent, testified that he handled a Volkswagon/Porsche/Audi account. He never advertised in Wheels and Keels. He said that he learned from David Mock in April, 1985, that the Caller–Times was offering half-price deals to car dealerships. Cardwell said that he spoke to Gary Crews at the Caller–Times who verified that fact. Cardwell indicated that Crews said that he had forgotten to tell him about it. Cardwell believed that it made no sense for a salesman to neglect to tell a customer about a half-price deal. Testimony was offered that the Caller–Times' salesmen were paid on a per-line basis. Only one car dealer who did not advertise with Wheels and Keels received the half-price Thursday ads. Other dealers advertised but, for an unexplained reason, were not paying half-price.

Kathleen Katz testified that she had previously sold advertising for the Caller–Times. She later was employed by a newspaper, "Southside Today." According to Katz, a Caller–Times employee told her that it would not be a good idea to work for Southside Today because the Caller–Times would be calling on the same accounts and would offer special half-price deals like they had for Wheels and Keels customers. She said that it was not rare for Caller–Times' employees to make special deals for customers. Katz said that she believed that the half-price promotional offered to auto dealers on Thursdays was aimed at Wheels and Keels' customers. She also had heard that Paul York negotiated a low rate with the Caller–Times for not advertising with Wheels and Keels.

The evidence reflects that the Caller–Times advertising rates were available to everyone. The rates were printed on standard rate cards. Discounts were available, for example, by entering into a bulk contract. The Caller–Times would offer pro-

motional rates. Any variation on a promotion would be entered in a special "black book." The standard rates and black book rates were entered into a computer system and automatically billed at the end of the month.

Triad offered no evidence to show that any advertising rate, whether regular or promotional, was offered at a price below the Caller–Times' average variable cost. Nor was evidence offered that there were substantial barriers to entry. The Caller–Times urges the adoption of a rigid cost-based rule for determining whether its pricing policy was predatory. By its so doing, the Caller–Times presupposes that a selection be made between an "objective cost-based" test and a "subjective intent" test; the current status of federal law dealing with predatory pricing requires no such choice.

### The Current Predatory Pricing Standards

Although no consensus exists among the federal circuits and other authorities on the standards by which predatory pricing is established, all federal circuits have adopted cost-based methods for determining when a price is predatory. No federal circuit has adopted a pure "subjective intent" test.[1]

The Areeda/Turner test was developed to assist in the determination of whether a company has engaged in predatory pricing.[2] The test suggests that prices are *per se* legal if they exceed the defendant's average variable cost (AVC) and that prices are *per se* illegal if they are below AVC.[3] The Areeda/Turner test has provoked a great deal of judicial and academic comment. Indeed, virtually every federal circuit has discussed this test when deciding cases involving the issue of predatory pricing. While the *premise* for the Areeda/Turner test has been approved by every federal circuit that has been faced with the issue, several circuits have declined to make the Areeda/Turner test the exclusive method of proof, and several circuits have declined to adopt the *conclusive* presumption that prices above AVC are legal and prices below AVC are predatory.

At one end of the spectrum lies the Fifth Circuit and arguably the Second Circuit. In *Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.*, 735 F.2d 884, 891 (5th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985), the court holds that predatory pricing is not established unless the defendant has set his price below his AVC. Thus, in order to prove predatory pricing, a plaintiff *must* show that the defendant set his prices below AVC. Likewise, in *Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d 76, 88 (2d Cir. 1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), the court stated:

> We agree with Areeda and Turner that *in the general case at least*, the relation-

1. Several federal circuits have declined to adopt a definite test for identifying predatory pricing. *See Southern Pacific Communications Co. v. American Telephone and Telegraph Co.*, 740 F.2d 980, 1006 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985); *Barry Wright Corp. v. ITT Ginnell Corp.*, 724 F.2d 227, 231–36 (1st Cir.1983); *MCI Communications Corp. v. American Telephone and Telegraph Co.*, 708 F.2d 1081, 1123 n. 59 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 352 (3d Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982).

2. In 1975, Professors Phillip Areeda and Donald F. Turner published a law review article on predatory pricing in which they concluded that pricing below a firm's average variable costs (AVC) should be deemed predatory and pricing above AVC deemed nonpredatory. This economic theory for predatory pricing, the "Areeda/Turner" test, makes evidence of a firm's subjective intent irrelevant. Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975).

3. For the purposes of predatory pricing, costs are divided into *fixed* costs, *variable* costs and *total* cost. Fixed costs do not vary with changes in output. Variable costs vary with changes in output. Total cost is the sum of fixed and variable costs. Average total cost is obtained by dividing total cost by output. Average variable cost is the sum of all variable costs divided by output. Average total cost is higher than average variable cost for all output levels.

ship between a firm's prices and its marginal costs provides the best single determinant of predatory pricing. Thus, prices below reasonably anticipated marginal cost [AVC] will be presumed predatory, while prices above reasonably anticipated marginal cost [AVC] will be presumed non-predatory. (footnote omitted) (emphasis added).

One factor separating *Northeastern* from the classic monopoly situation is that the defendant offered more than one product. *Northeastern*, 651 F.2d at 88. Thus, because the defendant was a more diversified firm, serious problems arose when calculating costs; the accounting conventions used to allocate joint costs (those not directly attributable to a particular product) are arbitrary to a degree. *See Northeastern*, 651 F.2d at 89 n. 19. Nevertheless, the court selected the AVC rule as the method by which to measure this defendant's alleged predatory pricing. *Id.* at 90.

At the other end of the spectrum lies the Ninth Circuit's *Inglis–Transamerica* test. The Ninth Circuit uses the Areeda/Turner cost-based test to allocate the burden of proof. Thus, if the plaintiff proves that the defendant's prices were below AVC, the plaintiff has established a prima facie case of predatory pricing, and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they may have on competitors. If, however, the plaintiff proves that the defendant's prices were below average *total* cost but not below AVC, the plaintiff bears the burden of proving by a preponderance of the evidence that the defendant's pricing was predatory in the sense that "the anticipated benefits of the defendant's pricing were dependent upon its tendency to discipline or eliminate competition and thereby enhance the defendant's ability to reap the benefits of monopoly power in the aftermath." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1038 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

Furthermore, if the plaintiff cannot prove that the defendant's prices were below average *total* cost, the plaintiff must prove by clear and convincing evidence, i.e. that it is highly probably true, that the defendant's pricing policy was predatory. *Transamerica Computer Co., Inc. v. International Business Machines Corp.*, 698 F.2d 1377, 1388 (9th Cir.), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983).

Following the Ninth Circuit's lead, other federal circuits have refused to adhere to the strict Areeda/Turner cost-based measure, in favor of a test which considers other factors indicative of predation. In *D.E. Rogers Associates, Inc. v. Gardner–Denver Co.*, 718 F.2d 1431, 1437 (6th Cir. 1983), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984), the Sixth Circuit adopted the *Inglis* portion of the Ninth Circuit test. Likewise, in *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1496 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989), the Eleventh Circuit held that the test for predatory pricing must consider subjective evidence and should use average total cost as the point above which no inference of predatory intent can be made. In *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1346 (8th Cir.1987), the Eighth Circuit recognized that rigid adherence to a particular cost-based rule can produce injustice, and it held that AVC is "a marker of rebuttable presumptions, with the plaintiff holding the burden above and the defendant below." (footnote omitted). Finally, in *Instructional Systems Development Corp. v. Aetna Casualty and Surety Co.*, 817 F.2d 639, 648 (10th Cir.1987), the Tenth Circuit states, "although the relationship between price and marginal cost or average variable cost is a valuable indicator of predatory pricing, sales above average variable cost do not preclude a finding of predatory pricing if other factors are present indicating unreasonably anticompetitive behavior."

The underlying rationale for rejecting the strict Areeda/Turner AVC rule follows:

Although pricing below average total cost and above average variable cost is not inherently predatory, it does not follow, however, that such prices are never predatory. Predation exists when the

justification of these prices is based, not on their effectiveness in minimizing losses, but on their tendency to eliminate rivals and create a market structure enabling the seller to recoup his losses. This is the ultimate standard, and not some rigid adherence to a particular cost-based rule, that must govern our analysis of alleged predatory pricing.

*Inglis,* 668 F.2d at 1035. "To do otherwise would be to forget that the use of cost-price comparisons is not an end in itself but a means of interpreting the likely justification for particular pricing decisions." *Inglis,* 668 F.2d at 1037. Recently, the Eleventh Circuit explained:

> The Areeda and Turner test is like the Venus de Milo: it is much admired and often discussed but rarely embraced. Perhaps this reluctance to embrace is due to the substance from which it is formed. The Areeda and Turner test is carved from economic assumptions, not from antitrust statutes and judicial precedents. Perhaps this reluctance is due to attacks upon it. The Areeda and Turner test has been criticized for being impractical, for using statistic short-run analysis and for being too permissive of predatory activity; these criticisms break any notion that economists agree that the Areeda and Turner test is best.

*McGahee,* 858 F.2d at 1495–96 (footnotes omitted).

### The Evidence Presented at Trial Cost

Because the trial court entered judgment for Wheels and Keels and the issue of whether Caller–Times was selling below cost was not submitted to the jury, our role is to apply Tex.R.Civ.P. 279 (deemed finding rule) and review the record for some evidence to support a deemed finding, namely, that Caller–Times was selling below some measure of cost to customers of Wheels and Keels. *See generally Cielo*

*Dorado Development, Inc. v. Certainteed Corp.,* 744 S.W.2d 10 (Tex.1988).

The record is replete with evidence that Caller–Times offered half-price advertising to Wheels and Keels' customers. The question then becomes, "is there evidence in the record to show that these fifty-percent deals fell below Caller–Times' average variable cost or total cost?"

Stephen Sullivan, the Caller–Times' publisher, testified that the profit margin on both the Caller–Times, generally, and the "Pennysaver" was twelve percent, plus or minus five percent.[4] "Profit margin" is defined as: "Sales minus all expenses as a single amount. Frequently used to mean the ratio of sales minus all operating expenses divided by sales." BLACK's LAW DICTIONARY 633 (5th ed. 1983). Thus, the Caller–Times' costs were between 83% and 93% of its revenue. Giving Caller–Times the benefit of the doubt and assuming its costs were as low as 83%, selling advertising space at 50% of its normal revenue necessarily means that the Caller–Times' income for those ads fell 33% below its break-even point of 83%. For example, if a single ad in the "Pennysaver" sold for $1.00 and the Caller–Times' profit margin was 17%, then the Caller–Times made $0.17 on the ad. Its cost to produce the ad was $0.83. So, if it sold the ad for $0.50, it would have lost $0.33. In very simplistic terms, that is what the record reflects, *pricing below total cost.*

We agree with the Caller–Times' assertion that Triad offered no evidence to show that any advertising rate, whether regular or promotional, was offered at a price below the Caller–Times' *average variable cost.* Because there is no evidence of the Caller–Times' fixed costs, it is impossible to determine whether the Caller–Times was pricing below its average variable cost (AVC). Nevertheless, there is evidence ·showing that Caller–Times was pricing below its *total cost.*[5]

---

**4.** The "Pennysaver" is a supplemental product within the Caller–Times that contains classified advertising, exclusively.

**5.** Caller–Times challenges the method by which Wheels–Keels established pricing below to-

tal cost. The choice of any method of proof affects the weight of the evidence; it does not render the evidence without value as a matter of law, as the Caller–Times contends.

### Subjective Intent

Wheels and Keels presented sufficient evidence of exclusionary conduct on the part of the Caller–Times. There was evidence of targeting and special deals, supporting the jury's finding that the Caller–Times willfully or flagrantly targeted Wheels and Keels' customers. Thus, the jury found predation based upon evidence of both pricing below total cost and the Caller–Times' willful or flagrant targeting, i.e., its subjective intent.

■ *Inglis* places upon Wheels and Keels the burden of proving by a preponderance of the evidence that the Caller–Times pricing was predatory, tending to eliminate competition and enhance the Caller–Times' ability to reap the benefits of its monopoly power in the aftermath. Wheels and Keels satisfied that burden.

### The Appropriate Test for Predatory Pricing

While recognizing that several courts have adopted elements of the Areeda/Turner test, we do not believe any court, including the Fifth Circuit, has explicitly adopted the AVC rule in its entirety *for all cases.*

The Caller–Times cites two Fifth Circuit cases, *Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.,* 735 F.2d 884 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985) and *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). *Adjusters* relies on *American Excelsior* in holding that "predatory pricing is not established unless the defendant has set his price below his average variable cost [AVC]." *Adjusters,* 735 F.2d at 891. However, in *American Excelsior,* after finding no evidence of the defendant's predatory intent, the court concluded that a plaintiff must show pricing below average variable cost. *American Excelsior,* 517 F.2d at 722–24. Moreover, the court, citing *Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 1332–33 n. 12, 1336 n. 14, 18 L.Ed.2d 406 (1967) (where the Supreme Court relied upon evidence of

the defendant's subjective intent in finding predatory intent), recognized that pricing below cost may not be necessary in order to make out a prima facie case. *American Excelsior,* 517 F.2d at 724 n. 30. In *Adjusters,* the plaintiff argued that evidence was presented to support a finding that the defendant charged a price below average variable cost; the issue of the defendant's subjective intent was not raised in support of the predatory pricing claim. The bottom line is: the Fifth Circuit has not addressed the situation where a plaintiff shows both pricing below total cost *and* substantial evidence of the defendant's subjective predatory intent.

■ Considering the evidence presented at trial, we are of the opinion that the test for predatory pricing should consider subjective evidence. Thus, if the plaintiff shows pricing below average total cost, he bears the burden of proving by a preponderance of the evidence that the defendant's pricing was predatory. When attempting to meet this burden, the plaintiff must be permitted to introduce evidence of non-cost factors indicating the defendant's unreasonably anticompetitive behavior.

Predatory pricing provides objective, circumstantial evidence of predatory intent. When determining how the Legislature intended proof to be made of antitrust violations, common sense suggests that both objective, circumstantial evidence of prices and costs as well as direct and circumstantial evidence of subjective intent should be important. We must always be mindful that "[e]conomics provides the means for evaluating the facts, not the elements of an antitrust violation." *McGahee,* 858 F.2d at 1500 n. 29. The Caller–Times' first six points of error are overruled.

### Damages

■ There are three stages of proof in treble damage antitrust cases. First, the plaintiff must show that the defendant committed a violation of the antitrust laws; second, the plaintiff must show that the defendant's violation caused the plaintiff some harm, and third, the plaintiff must

show the amount of harm. *Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business*, 80 Harv.L.Rev. 1566, 1573 (1967) [hereinafter *Damages* ]. We have previously established that the evidence supports the jury's finding that the Caller–Times committed an antitrust violation; stage one is satisfied.

By its seventh, eighth, ninth, and tenth points of error, the Caller–Times challenges the jury's finding of $365,416.00 in actual damages for appellee's lost profits. Thus, the Caller–Times' complaint concerns the second and third stages of proof, causation and amount of damages.

### Causation

■ It is well-established that in private antitrust suits, the plaintiff must prove that the defendant's conduct caused it a loss. In some cases, evidence establishing a violation will support the inference that the plaintiff must have suffered some harm as a result; it establishes the first two stages of proof together, the violation and the causation. *Damages, supra,* at 1573. Such was the case in *Story Parchment Company v. Paterson Parchment Paper Company*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). In *Story*, the United States Supreme Court held that the unrebutted proof of the defendant's below-cost price cuts, made to drive the plaintiff out of business, justified the jury's conclusion that the defendant caused the plaintiff, a competitor, some loss.

There is sufficient evidence in the record to support the jury's finding that Triad was injured in its business as a result of the Caller–Times' pricing practices. Triad was the Caller–Times' sole competitor in the relevant market, and the Caller–Times' priced its product to drive Triad out of business. As in *Story*, there is no uncertainty regarding the fact of damage, i.e., we have proof of the existence of a legal injury. Causation was established. The Caller–Times' seventh and eighth points of error are overruled.

### Amount of Damages

■ Once causation is established, the antitrust defendant bears the risk of uncertainty in the jury's assessment of the amount of damages. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). This compensatory principle is a familiar one, as the wrongdoer must always bear the risk of the uncertainty which his own wrong has created. *Id.*

With respect to the standard of proof required to fix the dollar amount of damages, the *Story* Court stated:

[T]here is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.

*Story*, 51 S.Ct. at 250 (citation omitted). Thus, the Supreme Court has developed a distinction by which a plaintiff who is able to prove that the defendant's antitrust violation cause it some loss is held to a less rigid standard of proof in fixing the dollar amount. *Damages, supra,* at 1572. While it is well-established by both Texas and Federal law that damages may not be determined by speculation or guesswork, an antitrust jury may make a just and reasonable estimate of damage based on relevant data, including probable and inferential proof as well as direct and positive proof. *See Bigelow*, 66 S.Ct. at 580. Admittedly, the result may be an approximation, but it is enough if the evidence shows the extent of the damages as a matter of just and reasonable inference. *Story*, 51 S.Ct. at 250; *Eastman Kodak Co. v. Southern Photo Materials, Co.,* 273 U.S. 359, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927). Difficulty in the ascertainment of damages is no longer confused with an antitrust plaintiff's right of recovery. *Story*, 51 S.Ct. at 251.

*Amount of Damages—Methods of Proof*

There are two relatively well-established methods by which a plaintiff can prove lost profits in private antitrust suits, the before and after method and the yardstick method. *Park v. El Paso Board of Realtors*, 764 F.2d 1053, 1068 (5th Cir.1985), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986).

## Before and After Method

■ The before and after test compares records of profits earned by the plaintiff prior to the impact of the violation with profits earned subsequent to it. *Park,* 764 F.2d at 1068; *see also Bigelow,* 66 S.Ct. at 580. A frequent problem in the application of this test is the existence of a separate illegal restraint imposed by the defendant during the prior period that the plaintiff uses to demonstrate its earning capacity, vitiating the reliability of the plaintiff's records as a means of proving what it would have earned in a free market. *See Story,* 51 S.Ct. at 252; *Eastman Kodak,* 47 S.Ct. at 405; *Damages, supra,* at 1574. The actual measure of damages is the difference between what the plaintiff would have made in a market unrestrained by the defendant and what the plaintiff in fact made. *Damages, supra,* at 1574. Thus, if the defendant's prior illegal restraint distorted profits in the earlier period, an adjusted competitive price level should be made to compute the plaintiff's earning capacity in a market free of anticompetitive activity. *Id.* at 1574–75; *see also American Crystal Sugar Co. v. Mandeville Island Farms, Inc.,* 195 F.2d 622, 625–26 (9th Cir.), *cert. denied,* 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952).

The "before and after" evidence adduced at trial reflected that in the first six months of operation, the later half of 1984, Triad doubled Wheels and Keels' revenues, grossing $42,300. In 1985, Triad increased Wheels and Keels' earnings four hundred percent, grossing $178,442. In 1986, Wheels and Keels grossed $214,466. In 1987, it grossed $164,362. Mr. Mock and Mr. Magel testified that they had expected to gross $375,000 in 1985, $500,000 in 1986, and $375,000 in 1987, absent the defendant's illegal restraint. It is patently true that Mock and Magel were interested witnesses. However, it is also true that Mock held a bachelor's degree in advertising and both men had several years experience in the newspaper business. In fact, while employed as a circulation manager for the Caller–Times, Magel was sent on a trip to California to examine the profit potential for a publication consisting solely of classified advertising. It was for the jury to determine the weight of the evidence, the credit to be given the witnesses, and the extent to which their testimony should be acted upon. *See Story,* 51 S.Ct. at 252.

## Yardstick Method

■ The yardstick test consists of studies of the profits of businesses closely comparable to the plaintiff's business. *Park,* 764 F.2d at 1068. Generally, this test is used by a plaintiff who is driven out of business by an antitrust violation before the plaintiff is able to compile a sufficient earnings record allowing the estimation of lost profits. *Damages, supra,* at 1575. The two methods, "before and after" and "yardstick," are not mutually exclusive and have been used together. *Id.; see also Bigelow,* 66 S.Ct. at 578; *Park,* 764 F.2d at 1068. The primary limitation on the yardstick test is that the business used as a measure must be as nearly identical to the plaintiff's business as possible yet unharmed from the violation. *Damages, supra,* at 1575; *see generally Richfield Oil Corporation v. Karseal Corporation,* 271 F.2d 709, 713–16 (9th Cir.1959), *cert. denied,* 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960) (where the antitrust plaintiff successfully proved the amount of damage by showing the sales of a comparable product).

■ As stated earlier in this opinion, the Caller–Times' "Pennysaver" publication is comparable to "Wheels and Keels." Triad introduced a summary of the Pennysaver's revenues from 1982 through 1986. The Pennysaver's average annual revenue was approximately $373,000, and its average annual profit was roughly $101,000. The

jury's answer to the damage question was $365,614 and was intended to compensate Triad for injuries sustained over a three year period. The fact that Triad's damages were uncertain in amount does not defeat its recovery, as the *Story* Court explained:

Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.

*Story*, 51 S.Ct. at 250. Triad sufficiently showed the extent of its damages as a matter of just and reasonable inference; therefore, the evidence adduced was sufficient. Points of error nine and ten are overruled.

■■■ By its eleventh point of error, the Caller–Times complains of the trial court's award of $124,688 in prejudgment interest to Triad. At trial, the jury returned a verdict supporting both of Triad's causes of action: violation of the Texas antitrust statute and tortious interference with business relations. The Caller–Times argues that the trial court erred by awarding treble damages under the Texas antitrust statute *and* prejudgment interest under the tortious interference claim. We agree.

"When a party tries a case on alternative theories of recovery and the jury returns favorable findings on two or more theories, the party has a right to judgment on the *theory* enabling him to the greatest or most favorable relief." *Boyce Iron Works, Inc. v. Southwestern Bell Telephone Company*, 747 S.W.2d 785, 787 (Tex.1988) (emphasis added). A party is entitled to the greatest relief under *either* theory that the verdict will support. *See Hargrove v. Trinity Universal Insurance Co.*, 152 Tex. 243, 256 S.W.2d 73 (1953). If a verdict contains more than one acceptable measure of damages, the plaintiff may *elect* the recovery he desires. *Century 21 Page One Realty v. Naghad*, 760 S.W.2d 305, 309 (Tex.App.—Texarkana 1988, no writ).

Thus, a trial court's judgment should be drafted to award a party all of the relief to which it is entitled. *Birchfield v. Texarkana Memorial Hospital*, 747 S.W.2d 361, 367 (Tex.1987); Tex.R.Civ.P. 301.

Triad's actual damages were trebled pursuant to the Texas antitrust statute (Tex. Bus. & Com.Code Ann. § 15.21(a)(1) (Vernon 1987)). Section 15.21(a)(1) provides, in relevant part:

[I]f the trier of fact finds that the unlawful conduct was willful or flagrant, it shall increase the recovery to threefold the damages sustained ... provided that interest on actual damages as specified above [interest from the date of service to the date of judgment[6]] may not be recovered when recovered damages are increased threefold.

After the verdict was returned, Triad elected to recover under the Texas antitrust statute, and its damages were increased threefold. While Triad was entitled to the greatest relief under *either* theory, it was not entitled to recover under both theories. The trial court's judgment is MODIFIED, reduced by $124,688.07.

The trial court's judgment orders the Caller–Times "to refrain from targeting Plaintiff's customers or potential customers for special deals or concessions." By point of error twelve, the Caller–Times contends that this injunction is overbroad and vague. Triad concedes the same. The Texas antitrust statute (Tex.Bus. & Com. Code Ann. § 15.21(b) (Vernon 1987)) authorizes injunctive relief.

■■■ While an injunctive decree need not specifically enumerate every possible act constituting the unauthorized practice, it should inform the defendant of the acts it is restrained from doing, without calling for inferences about what conduct is prohibited. *Ex Parte Slavin*, 412 S.W.2d 43, 45 (Tex.1967); *Hellenic Investment, Inc. v. Kroger Company*, 766 S.W.2d 861, 866 (Tex.App.—Houston [1st Dist.] 1989, no writ). An injunctive decree should not be framed so broadly as to prohibit lawful

---

**6.** Triad's original pleading is not contained in the transcript, making it impossible for this

Court to determine the date of service on the Caller–Times.

rights. *Villalobos v. Holguin,* 208 S.W.2d 871, 875 (Tex.1948); *Hellenic,* 766 S.W.2d at 866.

In the present case, the injunction fails to specify what "special deals and concessions" means. It also fails to adequately identify "plaintiff's customers" or "potential customers." The decree fails to define clearly the type of conduct it seeks to prohibit. The injunction, in its present form, is hereby DISSOLVED.

Having addressed all issues raised which are necessary for a proper determination of this appeal, we decline to address appellant's thirteenth and fourteenth points of error. Tex.R.App.P. 90(a). The trial court's judgment, as MODIFIED, is AFFIRMED.

NYE, C.J., dissents.

NYE, Chief Justice, dissenting.

I would overrule Triad's motion for rehearing and adhere to our original opinion for two reasons. First, evidence of subjective intent is irrelevant and should not be considered under the test set forth by the Fifth Circuit. Second, there is no evidence of pricing below total cost.

### THE FIFTH CIRCUIT TEST

I disagree with the majority's determination that the Fifth Circuit has not adopted the AVC rule in all cases except those in which barriers to entry are pronounced.[1] I also disagree with the majority's decision that we should not follow the Fifth Circuit.

The Fifth Circuit Court of Appeals has defined predatory conduct to mean that a defendant must have *at least* sacrificed present revenues for the purpose of driving its competitor out of business with a goal toward recouping losses through subsequent higher prices. *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714, 723 (5th Cir.1975). In *Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc.,* 735 F.2d 884, 890–91 (5th Cir.1984), the Fifth Circuit held that

where barriers to entry are not pronounced, predatory pricing *is not established* unless the defendant has set his price below average variable cost. In *Adjusters,* the Court wrote:

The objective economic approach to predation that we adopted in *American Excelsior* is still the law of this circuit.... We were unwilling, in an attempted monopolization case, to relegate the intent element to the status of an automatic and irrebuttable inference.

The Court went further to hold:

Where the *Malcolm* [*v. Marathon Oil Co.,* 642 F.2d 845 (5th Cir.1981)] panel noted the ongoing debate between partisans of an economic test for predation—The Areeda–Turner approach—and partisans of an intent test—the Sullivan approach—and disclaimed any view of the merits of these alternative analytical frameworks, *this court had already joined the economic camp in American Excelsior, and that decision bound the panel deciding Malcolm as it binds this panel. Id.* at 890.

This test was recently reiterated by the Fifth Circuit in *Phototron Corp. v. Eastman Kodak Co.,* 842 F.2d 95, 99 n. 4 (5th Cir.1988).

In instances in which the Fifth Circuit has been faced with the question of the requisite proof for establishing a predatory pricing claim, the Court has stated that the test includes pricing below marginal or average variable cost. Even in *C.E. Services, Inc. v. Control Data Corp.,* 759 F.2d 1241 (5th Cir.1985), cited by Triad, the Court found evidence that the alleged monopolizer was selling below average variable cost. The reason that subjective intent was not raised in support of the predatory pricing claim in *Adjusters* is that the Court specifically held that when barriers to entry are not pronounced, predatory pricing is not established unless the defendant has set his price below average variable cost. An inquiry into subjective intent would be irrelevant to the Court's determination of

---

**1.** Here, it was undisputed that there were no insurmountable barriers to entry. Triad entered the market with a $10,000.00 investment.

whether the trial court was correct in granting judgment notwithstanding the verdict.

Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor. These laws are concerned with substantial impairment of the vigor or health of the contest for business, regardless of which competitor wins or loses. These laws do not insure the right of every small businessman to succeed. These laws only insure that each businessman is not treated unfairly.

The evidence in the record before us showed that Caller–Times made some price reductions. This is no more exclusionary than permanent low prices. Low price, without evidence that the Caller–Times was operating below some measure of cost, is competitive rather than predatory. This is ideal, not illegal.

There are problems inherent in whatever test we choose to embrace. It is extremely difficult to determine whether a price set by a competitor was to attract customers and expand market share or to eliminate competitors. The former benefits competition; the latter stifles it. The objective test adopted by the Fifth Circuit is a means by which competitive behavior and predatory behavior can best be discerned. It is also a test which will allow us to properly carry out the purpose of our Texas Act and free competition generally.

### THE PROPOSED TEST

The majority decides that the test for predatory pricing should be two-part. The plaintiff bears the burden of showing prices below average total cost. If this burden is met, the plaintiff bears the burden of proving that the defendant's pricing was predatory. Non-cost factors indicating the defendant's unreasonably anticompetitive behavior would be admissible, both objective and subjective. This proposed test is similar to that set forth in *McGahee v. Northern Propane Gas Company*, 858 F.2d 1487, 1502–4 (11th Cir.1988).

Even under the test proposed by the majority, the evidence in this case fails.

There is no evidence in the record that the Caller–Times sold any advertising below its average total cost. Average total cost is the sum of average variable cost and average fixed cost. *McGahee*, 858 F.2d at 1496 n. 22. It means the average of the total economic cost, which includes the necessary minimum profit. The amount of profit that is part of total economic cost is generally an issue of fact requiring expert testimony, a burden upon all who seek to recover on an antitrust claim. The only evidence in the record concerning any economic factor was Stephen Sullivan's testimony that the profit margin on both the Caller–Times and the Pennysaver was twelve percent, plus or minus five percent. There was testimony that both publications made a profit. There was no evidence offered concerning what it costs the Caller–Times to run an ad like the ones that were offered to Caller–Times customers at a discount.

The evidence which the majority primarily looks to as support for its claim is testimony that the Caller–Times offered half-price ads to auto dealers on Thursdays during the month of May 1985. Magel and Mock had purchased Wheels and Keels about a year earlier in mid–1984. They broke into the market for $10,000 and were still operational in May 1985, when the Caller–Times offered these ads. There was no evidence of any sort that a 50% discount on an ad was in any way below the total average cost for that advertisement. Evidence that the publication as a whole profited a certain percentage rate does not mean that the Caller–Times was operating unprofitably in regard to its automobile ads for those specific Thursdays in May 1985. No evidence was offered calculating the average total cost of running a page of advertising. No evidence was offered calculating the average total cost of running the newspaper. The evidence does not reflect whether the automobile ads in question generally cost more or less than the scores of other types of ads which are placed daily with the Caller–Times. Information of this nature should have been and could have been garnered through the nor-

mal discovery process. Evidence of the cost to produce an inch, a line, or a page of advertising would have been relatively simple to attain.[2] To now allow Triad to use general testimony concerning total profitability of the newspaper to support its notion that the Caller–Times was selling advertising below total average cost is incorrect.

It is clear from the record that Triad saw no need for any "cost" threshold to be crossed in order for it to recover. It was relying totally on subjective intent. The majority holding essentially relieves Triad of proving the first element of the test it seeks to adopt.

I believe that the Fifth Circuit test provides an accurate means of separating truly predatory conduct from competitive conduct. We should follow it. If we choose to announce a new standard, we should give fair warning of the law we intend to follow.

**2.** In *Main Street Publishers, Inc. v. Landmark Communications, Inc.,* 701 F.Supp. 1289, 1293–4 (N.D.Miss.1988), the information on various costs of advertising was available to the parties. This case involved publications similar to the case at bar.